**Kelly Jean WILLIS, Plaintiff,**

v.

**Gene BARKSDALE, et al., Defendants.**

**No. 81–2051–G.**

United States District Court,
W.D. Tennessee, W.D.

Dec. 11, 1985.

---

Jeffrey Jones, James D. Kopernak, Memphis, Tenn., for plaintiff Kelly Jean Willis.

H. Wallace Maroney, Jr., Memphis, Tenn., for defendants Barksdale and Coop.

Carroll C. Johnson, Memphis, Tenn., for defendant Shelby County.

### MEMORANDUM OPINION

GIBBONS, District Judge.

In this case plaintiff Kelly Jean Willis as next of kin seeks damages for the death of her brother Michael B. Lott, a pretrial detainee who died in the Shelby County Jail during the heat wave of 1980. Defendants in the case are Shelby County Sheriff Eugene Barksdale; William Coop, Chief Jail Administrator at the time of Lott's death; and Shelby County. The case was heard by the court without a jury. The court has considered all the evidence in the case and the applicable law.

### I. FINDINGS OF FACT

Michael Lott was 26 years old in 1980. In March of 1980 he was arrested and charged with the misdemeanor of carrying a pistol. Bond was set at $500. Lott did not make bond and thus remained in the Shelby County Jail pending the disposition of his case. On May 27, 1980, Lott was sent to Central State Psychiatric Hospital. He was returned to the Shelby County Jail on July 9, 1980.

At approximately 2:00 a.m. on July 16, 1980, Lott was discovered dead in his cell at the Shelby County Jail. He had made no prior complaint of illness. When he was found, he was wearing a tee shirt, standard long jail pants, and wool socks. The Shelby County Medical Examiner determined that the cause of death was heat stroke. The temperature inside the jail when Lott was found was 96°. Outside it was 89°. The high on July 15 and 16 was 105°.

In July 1980, Memphis experienced a severe heat wave. The average daily temperature first rose above the expected average on June 25 and stayed above normal for 26 consecutive days. For fifteen consecutive days—July 6 to July 20, 1980—the high temperature rose above 100°. During this time some eighty deaths in the city derived from heat-related causes.

At the time of his death Lott was housed in a cell block area reserved for prisoners with medical or mental problems. Two floor fans approximately twenty-four inches in diameter cooled the area. The fans were operating the night of Lott's death. A fan was located two cells away from Lott's cell. In addition, there were eight windows in the cell block covered with screens and bars. Ice and water were available to inmates and were either passed out by guards or requested by inmates. Extra salt was provided to inmates at meals. Inmates were permitted to remove their outer clothing while in the cell block. Instructions for handling heat exhaustion and heat stroke had been distributed to jail personnel.

The testimony of defendant Coop, Inspector C.A. Ballard, shift commander on the night of Lott's death, and John Thomas Yancy and R.L. Hughes, deputies who found Lott's body, indicates that the jail and sheriff's department officials were aware of the unusual temperature conditions in the jail at the time of Lott's death. All of these individuals were employees of the sheriff's department. Memphis Area Legal Services attorney Laurice Smith also testified that her office received numerous complaints about conditions in the jail during the 1980 heat wave and that these complaints were communicated to defendant Coop.

While at Central State Psychiatric Hospital Lott had been taking 60 milligrams of Haldol at bedtime and 2 milligrams of Kemadrin. Upon his return to the Shelby County Jail, Dr. D. Earl prescribed 60 milligrams of Haldol at bedtime and 2 milligrams of Cogentin twice daily, according to a form entitled "Medical Department— Shelby County Sheriff's Office" (exhibit 13). The medical department of the sheriff's office was staffed by employees of the county health department. No health department employees were named as defendants in this lawsuit. The prescribed medications were administered to Lott by

the medical department as ordered while he was in the Shelby County Jail. John Bunso, director of the jail infirmary and a health department employee, testified that, although he is not a doctor, he knows the side effects of drugs given to inmates.[1]

Haldol and Cogentin are antipsychotic drugs. Both are known to be related to heat stroke and reduce the body's ability to sweat. Haldol also impairs the body's ability to regulate its temperature.

Dr. William B. Applegate, a doctor of internal medicine, testified for the plaintiff. In response to a hypothetical question containing the pertinent facts about Lott, jail conditions and the medications administered to Lott, Dr. Applegate gave an opinion that the effects of the medications combined with environmental conditions to cause the death of the individual described in the hypothetical.

Dr. Applegate also testified that 60 milligrams of Haldol was a "potentially lethal" dose, but that possibly an individual could build a tolerance to those amounts. Plaintiff's attorney then rephrased his hypothetical question to include administration of six milligrams of Haldol daily, which Dr. Applegate said would be on the high side of a therapeutic dose. Even at this lowered amount, Dr. Applegate's opinion as to the cause of death remained the same. In any event, defendants Barksdale and Coop admitted that 60 milligrams of Haldol were distributed to Lott at bedtime.

Defendants produced no evidence to contradict plaintiff's proof concerning cause of death.

No extra measures were taken to protect Lott from heat due to the drugs he was taking. He was exposed to the same conditions as all other inmates.

In 1975 Chief Judge Robert M. McRae, Jr. of the Western District of Tennessee found in *Hudson v. Nixon*, C-72-378, that the constitutional rights of certain inmates, including pretrial detainees, were violated by conditions in the Shelby County Jail —the same facility in which Lott died. A 1975 consent order in that case required the defendants, who included the sheriff, chief jailer, and Shelby County Quarterly Court, to provide adequate air circulation in the jail by installing fans in each cell block area. All defendants in this case were aware of the *Hudson v. Nixon* ruling.

The sheriff is an official popularly elected by county residents who has the statutory responsibility for safekeeping all prisoners within the jail. T.C.A. Sections 8-8-201 and 41-4-101. Defendant Barksdale delegated to defendant Coop, his subordinate, the responsibility for day to day operation of the jail and for development and implementation of jail policy. It was also Coop's responsibility to effect compliance with the *Hudson v. Nixon* order.

During the heat wave, Coop made sure that inmates had access to medical attention for heat-related problems, that inmates were aware of symptoms of such problems, that additional salt and ice water were available, and that the fans were in place and in operation. Beyond that, however, the initiative to develop and implement policies to deal with the health problems associated with the extraordinary heat lay with the medical department. For example, the medical department had elderly inmates moved to a cooler area.

The Shelby County Board of Commissioners approves a budget prepared and submitted by the sheriff. At the time of Lott's death, a new Shelby County Jail was under construction, but not yet ready for use. Defendant Coop testified that his superiors had advised him to hold down spending on the old facility pending the move. In budget planning he was instructed to make no plans for major capital expenditures. The only specific individual whom Coop could identify as giving such advice was a Mr. Kimbrough, described as

---

1. It is unclear whether Coop was aware of Lott specifically prior to his death. Coop did testify that he was aware that Lott had medical needs "according to the records." He was not asked when he became aware of those needs. In any event, there is no evidence that Coop knew of the possible consequences of Lott's medication.

chief financial officer for the county commission. Coop did ask for and receive an appropriation for replacement fans which were ordered July 1, 1980.

Lott had a history of intermittent hospitalization for mental illness from 1972 until the time of his death. He dropped out of high school in the eleventh grade and served in the army from 1970–72. He received an undesirable discharge from the army. He held a few jobs for short periods of time after leaving the army, but had not worked for several years preceding his death. In 1976 his discharge was upgraded and he was able to receive social security disability benefits of approximately $400 per month. These benefits were his only income at the time of his death. Plaintiff testified that Lott was not able to cope with the stress of a job situation. Lott's life expectancy at the time of his death was 44.9 years.

Plaintiff incurred $1,600 in funeral and burial expenses for Lott as a result of his death.

## II. CONCLUSIONS OF LAW

Plaintiff asserts that she is entitled to recover damages for Lott's death under 42 U.S.C. Section 1983 and under state law.

### A. The Section 1983 Claim

Due process claims for injuries inflicted under color of state law may proceed either upon the theory that state officials have committed a substantive due process violation or that state officials have occasioned a deprivation without procedural due process. *Wilson v. Beebe,* 770 F.2d 578, 583 (6th Cir.1985) (*en banc*). Both theories are potentially applicable here.

#### 1. Substantive Due Process

Plaintiff contends that defendants' policy decisions concerning the jail's ventilation violated Lott's substantive due process liberty right to reasonably safe conditions of confinement. Lott certainly had such a constitutional right. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982); *Davidson v. O'lone,* 752 F.2d 817, 821–822 (3d Cir.1984) (*en banc*), *cert. granted sub nom., Davidson v. Cannon,* —— U.S. ——, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); *Santana v. Collazo,* 714 F.2d 1172, 1183 (1st Cir.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); *Sampson v. King,* 693 F.2d 566, 569 (5th Cir.1982); *Hirst v. Gertzen,* 676 F.2d 1252, 1263 (9th Cir.1982); *Simmat v. Manson,* 554 F.Supp. 1363, 1375–1376 (D.Conn.1983); *Hamilton v. Covington,* 445 F.Supp. 195, 202 (E.D.Ark. 1978). *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979)[2] provides the analytical framework for determining whether that right was infringed:

**2.** Plaintiff contends that *"Bell v. Wolfish* may be the cornerstone for analyzing most jail-detainee fact situations, but the case would have no logical relevance to a situation comprised of an externally imposed duty on the jailer and an alleged breach thereof." Plaintiff's Trial Brief at 10. According to plaintiff, the consent order in *Hudson v. Nixon,* No. C–72–378 (W.D.Tenn. Aug. 20, 1975) (McRae, J.), constitutes the "externally imposed duty" the breach of which amounts to a constitutional violation cognizable under Section 1983.

*Hudson v. Nixon* imposed a host of remedial measures to rectify the constitutionally deficient condition of the Shelby County Jail. One such measure was the "install[ment of] fans in every cellblock area for the purpose of providing adequate air circulation therein." Par. 17, p. 6. *Hudson v. Nixon* did not hold, however, that the air ventilation problems *alone* violated any constitutional rights. In the absence of such a holding, the defendants' alleged breach of the court-imposed responsibility to provide adequate air ventilation does not in and of itself arise automatically to the level of an independent constitutional deprivation.

In any event, defendants fully complied with the dictates of *Hudson v. Nixon.* The uncontroverted evidence indicates that fans were, in fact, placed in every cellblock, including Lott's. Therefore, *Bell v. Wolfish* applies and provides the standard by which the defendants' conduct is evaluated to determine whether a substantive due process violation occurred.

It is also interesting to note that, according to the Findings of Fact and Conclusions of Law in *Hudson v. Nixon,* No. C–72–378, slip op. at 1 (W.D.Tenn. Feb. 4, 1976) (McRae, J.), "[n]either the Consent Order nor the proof reflect any lack of quality of medical care in the jail which approaches constitutional dimension."

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.

■ The meaning of "punishment" within the context of *Bell v. Wolfish* does not wholly coincide with the lay definition of "punishment." An actual intent to inflict punishment on the part of jail officials need not be present. When that intent is lacking, a court must engage in something akin to a "totality of the circumstances" test to determine the reasonableness of the jail officials' conduct:

A court must determine whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." ... Thus, if a particular detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is *arbitrary or purposeless*—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 538–539, 99 S.Ct. at 1873–1874 (citations omitted) (emphasis added). *Cf. Youngberg v. Romeo,* 457 U.S. at 320–323, 102 S.Ct. at 2460–2462.

■ In applying the *Bell v. Wolfish* standard to the situation here, the court must recognize that the Supreme Court has recently "reaffirmed the very limited role that courts should play in the administration of detention facilities." *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984). *See also Bell v. Wolfish,* 441 U.S. at 539, 99 S.Ct. at 1874 ("Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.") Consistent with its "limited role," the court finds that the jail temperature that existed at the time of Lott's death, though oppressive, does not amount to "punishment" under the *Bell v. Wolfish* standard.

Plaintiff essentially asserts that defendants' failure to expend large sums of money for ventilation equipment was an "arbitrary and purposeless" response to the jail's air circulation problems. In support of this assertion, plaintiff correctly points out that courts had confronted ventilation problems at the jail prior to Lott's death. *Hudson v. Nixon,* C–72–37 (W.D.Tenn. 1975) (McRae, J.) (consent order requiring, *inter alia,* improvements in the jail's air circulation). Defendants respond to this argument by pointing out that they did, in fact, install fans pursuant to the order in *Hudson v. Nixon.* They correctly note that nothing in the record indicates that this action failed to make the jail's temperature and ventilation tolerable and safe both before and after the July 1980 heat wave.

■ Further, the July 1980 heat wave was an extraordinary event that might well have made meaningless even more sweeping improvements. Defendants coped by providing additional ice, water and salt and by permitting inmates to remove outer clothing. Despite these measures, jail conditions remained harsh during the heat wave. Perhaps more could have been done to alleviate inmates' discomfort. Yet Lott's tragic death in the jail was an isolated incident and apparently occurred only because unusually excessive heat combined with Lott's unusually acute sensitivity to heat. Therefore, defendants' decision not to make a significant capital expenditure

for circulation equipment was not an irrational, arbitrary or purposeless response to the jail's ventilation problems, particularly in light of the fact that a new jail was nearing completion. Such an expenditure would have involved "substantial costs that a facility's administrators might reasonably attempt to avoid." *Block v. Rutherford,* 104 S.Ct. at 3234 n. 9. *See also O'Bryan v. County of Saginaw,* 741 F.2d 283, 285 (6th Cir.1984). Jail conditions at the time of Lott's death thus did not amount to "punishment" within the meaning of *Bell v. Wolfish.*

Plaintiff also asserts that defendant Coop's failure to institute procedures by which jail personnel could discover and accommodate the unique medical needs of individual prisoners violated Lott's substantive due process rights.[3] To incur liability for a failure to act, however, a defendant must have had an affirmative duty to act. *Jackson v. Joliet,* 715 F.2d 1200 (7th Cir. 1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984); *Dollar v. Haralson County,* 704 F.2d 1540 (11th Cir. 1983), *cert. denied,* 464 U.S. 963, 104 S.Ct. 399, 78 L.Ed.2d 341 (1984); *Jensen v. Conrad,* 570 F.Supp. 91, 110–111 (D.S.C.1983).

■ Here, defendant Coop, as chief jailer, had a duty derived from the constitution,[4] from Tennessee statutory law,[5] and from Tennessee common law,[6] to maintain reasonably safe conditions. Implicit in that duty is some responsibility to confront prisoners' basic medical needs. Towards that end, defendant Coop ordered certain measures to minimize the heat wave's impact on the prisoners' health. Yet Coop's duty did not extend to developing procedures to discover the special medical needs of individual inmates. Tennessee by statute specifically delegates to others the duty to

address inmates' specific medical problems.[7] Further, health department employees, not Coop, had direct responsibility for providing medical care, including administering medications, to particular inmates. It was their duty to discover the medical needs of particular inmates and to advise jail administrators of those needs. Absent evidence to the contrary, defendant Coop constitutionally could operate on the assumption that those responsible for providing medical care to particular inmates were discharging that duty properly and that they would communicate to him their professional judgment about medical needs of prisoners requiring his action.

■ Even assuming, *arguendo,* that defendant Coop had some sort of duty to address medical issues above and beyond the general responsibility to maintain reasonably safe conditions, his failure to implement procedures by which jail personnel could discover and accomodate the unique medical needs of individual inmates under extraordinary conditions did not violate Lott's substantive due process rights. As the Sixth Circuit recently stated in response to a claim that a police chief's failure to institute adequate suicide screening procedures violated the substantive due process rights of a pretrial detainee who hung himself in his jail cell:

> If a failure to act is reasonably related to a legitimate governmental objective, the failure to act cannot have the purpose of punishment unless the failure to act was deliberate. *Bell v. Wolfish* requires an intent to punish. Absent intent to punish, the police chief's failure to provide better suicide prevention training and to learn about and implement a new regulation and the City of Troy's failure to

---

**3.** In making this argument plaintiff points to no particular procedure which should have been adopted by Coop or which would have avoided Lott's tragic death.

**4.** See discussion, *supra* at 415–416.

**5.** *See, e.g.,* T.C.A. Sections 41–4–109 (provision of adequate food and bedding); 41–4–110 (segregation of sexes); 41–4–111 (maintaining clean-

liness and provision of toiletries/showers); 41–4–114 (delivering letters and permitting visitors); 41–4–138 (hiring nurses).

**6.** *Hale v. Johnston,* 140 Tenn. 182, 203 S.W. 949 (1918); *State ex. rel. Morris v. National Surety Co.,* 162 Tenn. 547, 39 S.W.2d 581 (1931).

**7.** See discussion, *infra* at 421–422.

employ better trained jailers do not amount to constitutional violations because the failures arose from the allocation of resources-time, personnel, and money, which constitutes a legitimate government purpose. Since the jury found that defendants were not deliberately indifferent, plaintiff could not recover under the *Bell v. Wolfish* standard for failures to act.

*Roberts v. Troy,* 773 F.2d 720, 725 (6th Cir.1985).

The record indicates nothing other than that defendant Coop's alleged failure "arose from the allocation of resources-time, personnel, and money." Defendant Coop neither intended to punish Lott nor displayed deliberate indifference to Lott's serious medical needs.[8] Therefore, no substantive due process violation occurred.

Buttressing this conclusion is the judicial trend, displayed in other contexts, towards limiting the potentially infinite sweep of Section 1983 as applied to substantive due process claims by requiring an intentionally harmful act that shocks the conscience of the court. *Wilson v. Beebe,* 770 F.2d at 586; *Davidson v. O'lone,* 752 F.2d at 828–829. Clearly defendants' conduct was not intended to harm Lott and does not shock this court's conscience.

### 2. Procedural Due Process

Under *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), Section 1983 encompasses claims for deprivations caused by "established state procedures" without adequate pre-deprivation procedural safeguards. Plaintiff contends that defendants' policy decisions concerning the jail's ventilation constitute the "established state procedure" by which the state deprived Lott of life.

■ As framed by plaintiff, her claim does not constitute a procedural due pro-

cess violation. Procedural due process properly applies to a deprivation caused by an allegedly flawed state procedure only when the deprivation could have legitimately occurred had the state afforded satisfactory pre-deprivation process. The alleged deprivation here is the kind of "official act [ ] which 'may not take place no matter what procedural protections accompany [it].' " *Wilson v. Beebe,* 770 F.2d at 586 (6th Cir.1985), quoting *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3208 n. 4, 82 L.Ed.2d 393 (1984) (separate opinion of Stevens, J.). Thus, if defendants' ventilation policies are characterized in their totality as an "established state procedure," then substantive due process or some textual constitutional right provides the appropriate analytical framework.

Plaintiff's claim implicates procedural due process, nevertheless. In *Wilson v. Beebe* the Sixth Circuit held that, under *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), Section 1983 encompasses a claim for the deprivation of liberty caused by a state official's "random and unauthorized" negligent act. 770 F.2d at 584. Here, plaintiff's complaint can be read to assert that defendant Coop negligently failed to discover and to accommodate Lott's unique medical needs.

The procedural due process inquiry does not end there, however. The court must determine whether Tennessee provides an adequate remedy for the tort. If Tennessee does, in fact, provide an adequate remedy, then the deprivation, though under color of state law, is not without due process of law. In turn, no Section 1983 claim exists. *Parratt v. Taylor,* 451 U.S. at 544, 101 S.Ct. at 1917; *Wilson v. Beebe,* 770 F.2d at 584.

Tennessee law provides three potential avenues of relief for injuries arising out of a chief jailer's negligence: T.C.A. Sections

---

**8.** The "deliberate indifference" standard derives from the Eighth Amendment right to be free from cruel and unusual punishment. Although Lott, "as a pretrial detainee rather than a convicted prisoner, was not within the protection of the eighth amendment ... the eighth amend-

ment rights of prisoners are analogized to those of detainees under the fourteenth amendment, to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial." *Roberts v. Troy,* 773 F.2d at 723.

8–8–302 [9] and 303(a),[10] 41–4–101,[11] and 29–20–201 et seq. (Governmental Tort Liability Act).[12] All three incorporate a "discretionary function" immunity that may bar recovery in this particular case (see discussion, *infra* at 420–422). Whether the existence of such an immunity renders the state's remedial scheme inadequate for purposes of a procedural due process claim under Section 1983 is an open question. *Compare Harper v. Scott*, 577 F.Supp. 15 (E.D.Mich.1984), *with Daniels v. Williams*, 720 F.2d 792 (4th Cir.1983), *aff'd*, 748 F.2d 229 (4th Cir.1984) (*en banc*), *cert. granted*, —— U.S. ——, 105 S.Ct. 1168, 84 L.Ed.2d 320 (1985). *Cf. Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3205, 82 L.Ed.2d 393 (1984); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (sovereign immunity defense is not, in itself, a deprivation of due process); *Cf. Juncker v. Tinney*, 549 F.Supp. 574 (D.Md.1982) (qualified good faith immunity does not render state remedy inadequate).[13]

The court need not reach that question, however, because Tennessee law provides an immunity-free remedy for injuries proximately caused by a state employee's negligence in the performance of a non-discretionary function. Pursuant to T.C.A. Section 29–20–205(1), plaintiff could have sued the county based upon the allegedly negligent acts and omissions of the health department's medical personnel whose direct and immediate responsibility it was to ensure the physical well-being of inmates in the jail. The functions required of them to safeguard Lott's health clearly were not discretionary so as to give rise to either the common law or statutory discretionary function immunity. Moreover, T.C.A. Section 29–20–205(2), which retains sovereign immunity for claims seeking redress of injuries arising from invasions of "civil rights," would not have barred a claim based on the medical personnel's acts because that section "only restores municipal immunity for civil rights claims as such, not those for negligence as a matter of common law." *McKenna v. City of Memphis*, 544 F.Supp. 415, 419 (W.D.Tenn. 1982). Plaintiff could also have sought re-

---

**9.** T.C.A. Section 8–8–302 provides: "Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves provided that the deputy is, at the time of such occurrence, acting by virtue of, or under color of his office."

**10.** T.C.A. Section 8–8–303(a) provides:

The governmental immunity of the county in which the said sheriff serves is waived for purposes of Section 8–8–302, but to an extent not in excess of the surety bond executed for that county's sheriff pursuant to Section 8–8–103.

**11.** T.C.A. Section 41–4–101 provides in pertinent part: "The sheriff of the county ... may appoint a jailer, for whose acts he is civilly responsible."

**12.** T.C.A. Section 29–20–205 provides in pertinent part: "Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment ..." This provision immunizes the employee(s) from liability up to statutory limits and beyond that, it exposes the employee(s) to liability and immunizes the governmental entity. *Cain v. Macklin*, 663 S.W.2d 794 (Tenn.1984). An employee may nevertheless avoid liability exceed-

ing the statutory limit by relying upon the discretionary function immunity provided by the common law. *See Binkley v. Hughes*, 168 Tenn. 86, 73 S.W.2d 1111 (1934); *State ex rel Robertson v. Farmers' State Bank*, 162 Tenn. 499, 39 S.W.2d 281 (1931); *Hale v. Johnston*, 140 Tenn. 182, 203 S.W. 949 (1918); *Dunbar v. Strimas*, 632 S.W.2d 558 (Tenn.App.1981); *Buckner v. Carlton*, 623 S.W.2d 102 (Tenn.App.1981).

**13.** *Wilson v. Beebe*, 770 F.2d 578 (6th Cir.1985) seems to imply that a state remedy is not rendered inadequate by the existence of a "discretionary function" immunity. In that case, the Sixth Circuit considered whether Michigan's discretionary duty immunity precluded recovery under state law against the defendant police officer. The court ultimately detemined that the defendant's negligence occurred during the performance of a ministerial, not a discretionary, act, so no immunity applied. Therefore, the court did not have to consider the interaction between sovereign immunity and the adequate state remedy inquiry. The court made absolutely no mention, however, of the possibility that a finding of immunity could render the state remedy inadequate. The strong implication of such conspicuous silence is that the Sixth Circuit does not believe that the availability of such immunity is a pertinent factor in the adequate state remedy inquiry.

covery against the health department employees for damages exceeding the limits of the Act.[14] Therefore, Tennessee's post-deprivation remedy is adequate and provides plaintiff all the process that is due. Consequently, plaintiff's Section 1983 claim alleging a violation of procedural due process must fail.

### B. Pendent State Claim

■ Tennessee statutory law provides, as stated above, three potential avenues of relief for injuries arising out of defendant Coop's failure to discover and accomodate Lott's special medical needs.[15] The two older statutes do not expressly retain immunity from suit for damages arising out of the performance of a discretionary function. Such immunity does exist, however, in the Tennessee common law, *Binkley v. Hughes,* 168 Tenn. 86, 73 S.W.2d 1111 (1934); *State ex rel Robertson v. Farmers' State Bank,* 162 Tenn. 499, 39 S.W.2d 281 (1931); *Hale v. Johnston,* 140 Tenn. 182, 203 S.W. 949 (1918); *Dunbar v. Strimas,* 632 S.W.2d 558 (Tenn.App.1981); *Buckner v. Carlton,* 623 S.W.2d 102 (Tenn.App. 1981); and was not abolished by express language or by implication in these statutes. Further, the Governmental Tort Liability Act (the Act) explicitly permits recovery for injury caused by a state employee's negligence *except* where the injury "[a]rises out of the exercise or performance or the failure to exercise or perform a discretionary function ..." T.C.A. Section 29–20–205(1). Since the Act was enacted most recently, and expressly covers "the sheriff and his employees," T.C.A. Section 29–20–102, any inconsistencies between it and the two older statutes must be resolved according to the former. Thus, the court finds that under Tennessee law, the county, the county sheriff and his employees, including deputies and jailers, are protected by a discretionary function immunity, whether a

plaintiff proceeds under the Act or one of the two older statutes.

The Tennessee Supreme Court has not yet defined "discretionary function" within the context of T.C.A. Section 29–20–205(1). The Tennessee Supreme Court has, however, defined the discretionary function immunity under the common law:

> Where the duty is absolute, certain, and imperative, and is simply ministerial, the officer is liable in damages to any one specially injured, either by his omitting to perform the task or by performing it negligently or unskillfully. On the other hand, where his powers are discretionary, and to be exerted or withheld according to his own judgment, he is not liable to any private person for a neglect to exercise those powers, nor for the consequences of a willful exercise of them, where no corruption or malice can be imputed to him, and he keeps within the scope of his authority.

*Hale v. Johnston,* 140 Tenn. 182, 197, 203 S.W.2d 949 (1918). *See also Binkley v. Hughes,* 168 Tenn. 86, 73 S.W.2d 1111 (1934); *State ex rel. Robertson v. Farmers' State Bank,* 162 Tenn. 499, 39 S.W.2d 281 (1931).

Moreover, in the context of determining whether a particular act was "ministerial" and thus subject to mandamus, the Tennessee Supreme Court has observed:

> While there is some conflict of opinion as to what constitutes, strictly speaking, a ministerial duty [as] distinguished from a discretionary duty, ... [it is said] that, where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial, but where the act to be done involves the exercise of discretion and judgment it is not to be deemed merely ministerial.

---

14. See footnote 12, *supra.*

15. T.C.A. Sections 8–8–302 and 303(a), 41–4–101, and 29–20–201 *et seq.* (Governmental Tort Liability Act). For a text of the pertinent parts of these statutes, see footnotes 9–12. Although the

basis for plaintiff's state law claim is unclear, she appears to rely exclusively on the Governmental Tort Liability Act. The analysis under each of the possible remedies is similar, however.

*State ex rel. Millers National Insurance Co. v. Fumbanks,* 177 Tenn. 455, 151 S.W.2d 148 (1941).

These passages provide guidance in ascertaining how the Tennessee Supreme Court would define "discretionary function" for the purposes of T.C.A. Section 29–20–205(1). A survey of other jurisdictions that have examined similar language in similar statutes reveals the following representative definition which the court believes Tennessee would adopt as its own:

> A ministerial function, as opposed to a discretionary function, has been defined as that of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed. On the other hand, a discretionary function may be fairly defined as one necessarily requiring the exercise of reason in the adoption of means to an end, and discretion in determining how or whether an act should be done or a course pursued.

*Jackson v. Wilson,* 581 S.W.2d 39, 43 (Mo. App.1979). Applying that definition, the court must now assess whether defendants' failure to discover and accommodate Lott's special medical needs was a "failure to exercise or perform a discretionary function." T.C.A. Section 29–20–205(1).

Tennessee common law imposes upon the sheriff and his chief jailer a duty to treat prisoners "kindly and humanely." *Hale v. Johnston,* 140 Tenn. 182, 203 S.W. 949 (Tenn.1918); *State ex rel. Morris v. National Surety Co.,* 162 Tenn. 547, 39 S.W.2d 581 (1931).[16] Tennessee statutory law imposes upon them, in impressive breadth and detail, a multitude of mandatory duties designed to promote the inmate's welfare.[17] By contrast, Tennessee does not impose upon the sheriff or his jailer any statutory duties directly and immediately related to the medical care of inmates.[18] In fact, Tennessee expressly assigns those duties to others. For example, T.C.A. Section 41–4–115(a) states that "[t]he county legislative bodies shall alone have the power, and it shall be, their duty, to provide medical attendance upon all prisoners ..." Furthermore, T.C.A. Section 41–4–116(c)(2) permits the county legislative body to appoint jail inspectors whose "duties" include the making of "rules and regulations for the preservation of the health and decorum of the prisoners ..." Finally, T.C.A. Section 41–4–140(a)(1) directs the Tennessee Corrections Institute to "establish minimum standards ... for the safekeeping, health and welfare of inmates."

Tennessee law, therefore, did not require defendants to ferret out and address the unique medical needs of each individual prisoner. Tennessee law permitted them to rely upon the county's medical personnel to treat prisoners' medical problems properly. True, it might have been wise for the sheriff or his jailer, consistent with their general common law duty to provide a relatively safe environment, to establish standard mechanisms by which the medical personnel would communicate effectively with the regular jail staff. However, it was well within their discretion how best to accomplish the task of promoting communication between the jail's medical and regular staffs so as to ensure the physical well-being of inmates with special medical needs. Thus, any failure on the part of these defendants to discover and to accommodate Lott's unusual condition constitutes a failure to perform a discretionary function.

**16.** Plaintiff argues that this common law duty of care creates a liberty interest the deprivation of which is actionable under Section 1983. The simple mandate to treat prisoners "kindly and humanely" does not, however, encompass a responsibility to ferret out and address prisoners' unique medical needs where that responsibility is expressly delegated by statute to others. See discussion, *infra.* Therefore, even if the common law created some sort of liberty interest, these defendants' actions here did not infringe that interest.

**17.** See Footnote 5, *supra* at 417.

**18.** There exists one slight exception. T.C.A. Section 41–4–138 empowers the sheriff to hire nurses for the purpose of preventing the spread of any contagious disease.

Plaintiff's state law claim is therefore barred.

Judgment shall be entered for defendants.