**Ronnie Lee McKNIGHT,
Plaintiff–Appellee,**

v.

**John REES, Defendant,**

**Daryll Richardson and John Walker,
Defendants–Appellants.**

No. 95–5398.

United States Court of Appeals,
Sixth Circuit.

Submitted March 11, 1996.

Decided July 10, 1996.

418

Ronnie Lee McKnight (briefed), Clifton, TN, for plaintiff–appellee.

Charles R. Ray (briefed), Ray & Housch, Nashville, TN, for defendants–appellants.

Before KEITH, MARTIN, and NELSON, Circuit Judges.

MARTIN, J., delivered the opinion of the court, in which KEITH, J., joined. NELSON, J. (pp. 425–26), delivered a separate opinion concurring in the judgment.

BOYCE F. MARTIN, JR., Circuit Judge.

Tennessee contracts with private corporations to operate its prison facilities. In their capacities as correctional officers, defendants Daryll Richardson and John Walker allegedly violated plaintiff Ronnie McKnight's Eighth Amendment right to be free from cruel and unusual punishment. Richardson and Walker now pursue this interlocutory appeal from the district court's denial of their motion to dismiss McKnight's section 1983 action.[1] Richardson and Walker argue that they are entitled to qualified immunity from suit, and that the district court erred in concluding otherwise. For the reasons set forth below, we AFFIRM.

McKnight filed this action under 42 U.S.C. § 1983 on March 3, 1994, against John Rees, the warden of the Corrections Corporation of America's South Central Correctional Center, and correctional officers Richardson and Walker.[2] Rees was subsequently dismissed from the suit, and his dismissal is not before this Court.

In his complaint, McKnight alleged that these officers violated his constitutional rights under the Eighth Amendment by subjecting him to tight restraints during his transport to another prison. He claims that

---

1. We have jurisdiction to hear this interlocutory appeal pursuant to the Supreme Court's decision in *Mitchell v. Forsyth,* 472 U.S. 511, 528–30, 105 S.Ct. 2806, 2816–18, 86 L.Ed.2d 411 (1985). We pause only to note that the Court's recent decision in *Johnson v. Jones,* — U.S. ——, ——, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995), does not alter our authority to hear an appeal from the denial of qualified immunity in cases in which the district court's decision rests on a legal conclusion. *Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817–18. *Johnson* held only that we do not have interlocutory jurisdiction to review a denial of qualified immunity when the district court bases its decision on the ground that a genuine issue of material fact exists. *Johnson,* — U.S. at ——, 115 S.Ct. at 2156; *Blair v. Meade* 76 F.3d 97, 100 n. 2 (6th Cir.1996). Where, as here, the district court bases its decision on a legal conclusion, our interlocutory jurisdiction remains intact.

2. Corrections Corporation of America is a private, for-profit corporation that has contracted with the State of Tennessee to maintain some of its correctional facilities.

the restraints caused him serious medical injury which actually required hospitalization. Finally, the complaint states that McKnight's protestations were ignored, and that Richardson and Walker taunted him after he complained about the restraints.

Richardson and Walker moved to dismiss the complaint, asserting that they were entitled to qualified immunity pursuant to their job function as correctional officers. The district court denied the motion to dismiss, holding that Richardson and Walker, as employees of a private, for-profit corporation, were not entitled to the defense of qualified immunity. This timely interlocutory appeal followed.

■ Section 1983 provides a cause of action against any person who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law.[3] 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992) (citation omitted). The Supreme Court has repeatedly recognized that "[w]hen government officials abuse their offices, 'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). Balanced against this concern is the equally important need to ensure that the threat of personal liability does not inhibit public officials from vigorously performing their duties as representatives of the public interest. *Id.* We are asked here whether accommodation of these competing interests warrants the extension of qualified immunity to corrections officers employed by a private corporation under contract with the State of Tennessee.

■ We begin by noting that *state employed* correctional officers do enjoy the protections of qualified immunity in carrying out their duties. *Procunier v. Navarette*, 434 U.S. 555, 561–62, 98 S.Ct. 855, 859–60, 55 L.Ed.2d 24 (1978); *Williams v. Bass*, 63 F.3d 483, 486 (6th Cir.1995). It is not immediately apparent, however, whether *private* correctional officers, performing by contract functions admittedly similar to those traditionally within the governmental sphere, should or should not be granted similar immunity. The principles undergirding qualified immunity do not necessarily apply with equal force when a private actor seeks its invocation.

In *Duncan v. Peck*, 844 F.2d 1261 (6th Cir.1988), this Court held that qualified immunity does not protect from subsequent liability private individuals who resort to state garnishment or prejudgment attachment procedures in pursuit of personal interests. *Id.* at 1264–66. In so holding, we examined the scope of the immunity doctrine developed by the Supreme Court, initially pointing out that "section 1983 allows no immunities on its face." *Id.* at 1263; *See also Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988–89, 47 L.Ed.2d 128 (1976). However, we also recognized that the Supreme Court has afforded governmental officials one form of immunity or another in a variety of situations. *Duncan*, 844 F.2d at 1263. Thoroughly examining the common law history of immunity for private individuals and the policy rationales traditionally used to justify immunity, we concluded that neither supported the grant of qualified immunity to the private actors in that case. *Id.* at 1264. The Supreme Court has embraced this position as well. *Wyatt*, 504 U.S. at 168–69, 112 S.Ct. at 1833–34 (holding that private parties invoking state garnishment or pre-

---

**3.** Richardson and Walker do not dispute that they were acting under color of state law for the purposes of section 1983 liability, even though each are privately employed by Corrections Corporation of America. Under the test set forth by the Supreme Court in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982), it appears that these defendants can be liable under section 1983, and are acting "under color of state law." *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1264–67 (3d Cir.1994) (discussing the *Lugar* test in depth). Nonetheless, we simply assume without deciding this fact for the purposes of this appeal.

judgment attachment statutes later found to be unconstitutional are not entitled to qualified immunity). We have recently reaffirmed this approach in a *Bivens* action. *Vector Research, Inc. v. Howard & Howard Attorneys P.C.,* 76 F.3d 692, 698–99 (6th Cir.1996) (holding that private attorneys who assisted federal agents in a search and seizure pursuant to an ex parte order could be liable for constitutional violations arising out of their conduct). Nonetheless, neither *Vector Research, Duncan* nor the Supreme Court's decision in *Wyatt* necessarily forecloses the application of qualified immunity here because each of those cases relied in part on the fact that the policy rationales that support qualified immunity did not apply on the facts. Further inquiry is needed, and we must examine the public policy underpinnings of qualified immunity to determine whether these defendants should be allowed to utilitize its protections.

■ When determining whether a private individual may claim qualified immunity as a defense to a section 1983 claim, the Supreme Court's decision in *Wyatt* teaches that we must look first to determine whether the "tradition of immunity [is] . . . firmly rooted in the common law." *Wyatt,* 504 U.S. at 164, 112 S.Ct. at 1831 (quoting *Owen v. City of Independence,* 445 U.S. 622, 637, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980)). However, we also note that the Supreme Court's decision in *Harlow v. Fitzgerald,* "completely reformulated qualified immunity along principles not at all embodied in the common law." *Anderson,* 483 U.S. at 645, 107 S.Ct. at 3042 (citing *Harlow,* 457 U.S. at 815–20, 102 S.Ct. at 2736–39). Therefore, although we have already recognized that there is "no evidence that the common law ever extended [qualified] immunity to include private citizens," *Duncan,* 844 F.2d at 1264, we conclude that, when determining whether qualified immunity is appropriate, the traditions of common law immunity inform our analysis but the presence or absence of immunity found there is not necessarily dispositive.

■ In addition to examining the historical roots of immunity, we also determine whether strong public policy reasons support the recognition of qualified immunity in particular cases. *Wyatt,* 504 U.S. at 164–66, 112 S.Ct. at 1831–32; *Duncan,* 844 F.2d at 1263–64 (relying on *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258–59, 101 S.Ct. 2748, 2755–56, 69 L.Ed.2d 616 (1981)). At this juncture of the analysis, we are informed by the Supreme Court's explanation that we must "examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted" to determine whether we should recognize qualified immunity in a given case. *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 542–43, 98 L.Ed.2d 555 (1988). Finally, when determining whether public policy supports the grant or denial of immunity, "[w]e do not have a license to establish immunities from [section] 1983 actions in the interests of what we judge to be sound public policy." *Tower v. Glover,* 467 U.S. 914, 922–23, 104 S.Ct. 2820, 2826, 81 L.Ed.2d 758 (1984). We turn now to a perusal of the various rationales utilized to support qualified immunity.

While discussing the rationale underlying the creation of immunity from suit in *Forrester v. White,* the Court explained that:

Suits for monetary damages are meant to compensate the victims of wrongful actions and to discourage conduct that may result in liability. Special problems arise, however, when government officials are exposed to liability for damages. To the extent that the threat of liability encourages these officials to carry out their duties in a lawful and appropriate manner, and to pay their victims when they do not, it accomplishes exactly what it should. By its nature, however, the threat of liability can create perverse incentives that operate to inhibit officials in the proper performance of their duties. In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above all are informed by considerations other than the personal interests of the decisionmaker.... When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full

fidelity to the objective and independent criteria that ought to guide their conduct. 484 U.S. at 223, 108 S.Ct. at 542. Emphasizing that courts should adopt a "functional" approach to questions of immunity, the *Forrester* Court characterized the inquiry as one in which courts should "seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of [the relevant government] functions." *Id.* at 224, 108 S.Ct. at 542.

In *Wyatt*, the Supreme Court held that private defendants may not invoke the protections of qualified immunity when charged with section 1983 liability after utilizing state replevin, garnishment, and attachment statutes later held to be unconstitutional. 504 U.S. at 168–69, 112 S.Ct. at 1833–34. The Court explained that the rationales advanced in support of qualified immunity for government actors are "not transferable to private parties." *Id.* at 168, 112 S.Ct. at 1833. The Court further elaborated:

> [W]e have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service....
>
> [P]rivate parties hold no office requiring them to exercise discretion; nor are they principally concerned with enhancing the public good. Accordingly, extending Harlow qualified immunity to private parties would have no bearing on whether public officials are able to act forcefully and decisively in their jobs or on whether qualified applicants enter public service. Moreover, unlike with government officials performing discretionary functions, the public interest will not be unduly impaired if private individuals are required to proceed to trial to resolve their legal disputes. In short, the nexus between private parties and the historic purposes of qualified immunity is simply too attenuated to justify such an extension of our doctrine of immunity.

*Id.* at 167–68, 112 S.Ct. at 1833–34 (citations omitted). The broad language used by the Court in this passage might lead one to believe that qualified immunity simply is not available to private party defendants, regardless of the nature of the act for which they are sued. However, the Court expressly limited its holding to the "precise issue" of whether qualified immunity is available to private defendants faced with section 1983 liability after utilizing a state replevin, garnishment or attachment statute. *Id.* at 168–69, 112 S.Ct. at 1833–34.

Accordingly, several circuits read *Wyatt* narrowly, as applying only to cases in which a private party invokes state law to pursue a private interest. *See Eagon v. Elk City,* 72 F.3d 1480, 1489 (10th Cir.1996) (discussing cases); *Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 794–95 (11th Cir.1992), *cert. denied,* 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993) (same). These circuits contrast two lines of cases in determining whether a private party should be granted qualified immunity under section 1983. In those cases rejecting a qualified immunity defense and falling within the scope of the Supreme Court's decision in *Wyatt,* private parties "invoked state law in pursuit of private ends," *Warner v. Grand County,* 57 F.3d 962, 966 (10th Cir.1995), which is precisely the situation this Court confronted in *Duncan. See, e.g., Burrell,* 970 F.2d at 796 (denying qualified immunity to private defendants who allegedly conspired with public officials for the sole purpose of depriving plaintiff of constitutional rights); *see also Howerton v. Gabica,* 708 F.2d 380, 385 n. 10 (9th Cir.1983) (denying qualified immunity to a landlord who enlisted the services of a police officer and conducted an allegedly unconstitutional eviction of tenant). However, where private defendants are fulfilling government contracts or following court orders, several circuits have held that the umbrella of qualified immunity protects the private actors. *Warner,* 57 F.3d at 965–66(qualified immunity extended to private crisis center director conducting strip search at the request of police officers); *Sherman v. Four County Counseling Ctr.,* 987 F.2d 397, 405–06 (7th Cir.1993) (qualified immunity for private psychiatric center for involuntary detention of allegedly mentally ill patient at the request of arresting officer); *Frazier v. Bai-*

*ley,* 957 F.2d 920, 928 (1st Cir.1992) (qualified immunity for social workers under contract with the state to provide investigation of child abuse claims). In *Warner* and *Sherman,* the Tenth and Seventh Circuits each held that *Wyatt* did not foreclose qualified immunity for private individuals who, at the request of a state officer, perform the duties allegedly giving rise to the section 1983 claim. *Warner,* 57 F.3d at 967; *Sherman,* 987 F.2d at 405–06.

In *Sherman,* the plaintiff had been involuntarily detained and given anti-psychotic medication pursuant to court order at the Four County Counseling Center. *Sherman,* 987 F.2d at 398–99. After his release from the center, Sherman sued pursuant to section 1983 the officer who arrested him and applied for the psychiatric evaluation, the state judge who assigned him for evaluation, the attorney who represented him at his preliminary hearing, Cass County, and Four County Counseling Center. On appeal, the Seventh Circuit considered whether Four County was entitled to qualified immunity for its actions. Answering the question in the affirmative, the court noted that Four County had accepted and administered care to Sherman under the state judge's emergency detention order, and had complied with procedures set forth by Indiana statutory law during Sherman's involuntary detention. *Id.* at 405. These facts, according to the court, warranted the extension of qualified immunity to Four County:

> The policy justifications which underlie the doctrine of qualified immunity for government officials apply with full force to Four County's activities here. Although it is a private hospital, Four County accepted and cared for a state mental patient committed on an emergency basis.... If the actions it took pursuant to court order subject it to suit, private hospitals might well refuse to accept involuntary patients. This refusal would increase the load on the strained resources of the state's public hospitals.... [O]ne purpose of qualified immunity is to avoid discouraging public service. Denying qualified immunity to private hospitals in this situation would do just that.

*Id.* at 405–06 (citations omitted).

The Seventh Circuit recently reaffirmed the *Sherman* holding in a case factually anal-

ogous to the case at bar. In *Williams v. O'Leary,* the court held that medical director and staff physician of the Stateville Correctional Center in Illinois were entitled to qualified immunity even though each was an employee of Correctional Medical Systems, a private company contracting with the state to provide medical services at state correctional facilities. 55 F.3d 320, 323–24 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 527, 133 L.Ed.2d 434 (1995). After reviewing the two lines of cases discussed *supra,* the *Williams* court held that "[t]he instant case clearly falls within the class of cases in which qualified immunity may be raised by a private defendant." *Id.* at 324. The court believed that the fact that the defendant was "performing duties that would otherwise have to be performed by a public official who would clearly have qualified immunity" weighed in favor of granting qualified immunity to the private defendant. *Id.* (quoting *Frazier,* 957 F.2d at 928).

In *Eagon v. Elk City,* the Tenth Circuit recently reaffirmed its rule that "a private individual who performs a government function pursuant to a state order or request is entitled to qualified immunity if a state official would have been entitled to such immunity had he performed the function himself." 72 F.3d at 1489 (quoting *Warner,* 57 F.3d at 967). One of the defendants in *Eagon* was a private party in charge of granting or denying applications for Christmas displays in a city park in Elk City, Oklahoma pursuant to a city council resolution. The lawsuit arose out of the denial of an application for a Christmas display. On appeal, the court addressed whether the private party defendant was entitled to assert a qualified immunity defense for her actions. Ultimately, the Tenth Circuit believed that qualified immunity protected the private defendant's actions, concluding that the defendant "was performing a government function pursuant to a government request," and therefore was entitled to qualified immunity for her actions. *Id.* at 1490.

Turning to the precise question presented in this case, we note that this is a case of first

impression in this circuit, and that no other circuit has addressed whether correctional officers employed by a private corporation under contract with the state are entitled to qualified immunity. Federal district courts are in conflict on the issue. *See Citrano v. Allen Correctional Ctr.*, 891 F.Supp. 312 (W.D.La.1995) (extending qualified immunity to private correctional officers); *Smith v. United States,* 850 F.Supp. 984 (M.D.Fla. 1994) (same). *But see Manis v. Corrections Corp. of America,* 859 F.Supp. 302 (M.D.Tenn.1994) (refusing to grant qualified immunity to correctional officers employed by private corrections corporation). Some of these courts utilized a functional approach to conclude that correctional officers employed by private corporations under contract with the state are entitled to qualified immunity. *E.g., Citrano,* 891 F.Supp. at 316–17. At least one has concluded that the public policy underpinnings of qualified immunity do not support extending its protections to private correctional officers. *Manis,* 859 F.Supp. at 305.

■ Broadly stated, the Supreme Court has "followed a 'functional' approach to immunity law." *Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985) (quoting *Harlow,* 457 U.S. at 810, 102 S.Ct. at 2734); *Briscoe v. LaHue,* 460 U.S. 325, 342, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983) (stating that "our cases clearly indicate that immunity analysis rests on functional categories" rather than "on the status of the defendant"). Relying on this fact, some circuits emphasize the function performed by the private party in determining whether to extend qualified immunity to the private defendant. For example, the First Circuit has held that "private parties under contract to perform statutorily mandated governmental duties are entitled to qualified immunity as functionally government employees." *Frazier,* 957 F.2d at 928; *see also Williams,* 55 F.3d at 323 (stating that qualified immunity extends to "a private party acting under a government contract fulfilling a governmental function; parties fulfilling statutorily mandated duties under a contract; and a physician acting pursuant to a court order") (quoting *Sherman,* 987 F.2d at 405). While we do not disagree that we must ex-amine the function or nature of the conduct at issue as an initial matter, we do not believe the analysis begins and ends with asking the question whether the private party is performing a government function. We must also examine whether the "special policy concerns involved in suing government officials," *Wyatt,* 504 U.S. at 167, 112 S.Ct. at 1833, also support the grant of qualified immunity to private actors performing what are traditionally governmental functions, as is the case here. *See Vector Research, Inc.,* 76 F.3d at 698–99. Therefore, we next discuss whether the public policy underpinnings of qualified immunity support extending its protections to the private defendants here, guided in our analysis by the informed opinions of our sister circuits discussed above, and the Supreme Court's pronouncements on the issue.

■ Very generally, "qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt,* 504 U.S. at 167, 112 S.Ct. at 1833 (citing *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738–39). At its core, the protection "acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Id.* at 168, 112 S.Ct. at 1833. Immunity seeks "to ensure that talented candidates [are] not deterred by the threat of damage suits from entering public service." *Id.* at 167, 112 S.Ct. at 1833; *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737 (stating that immunity serves to prevent the "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service").

The public undoubtedly has an interest in maintaining secure and efficient correctional facilities. We need not recite the litany of public benefits traditionally associated with maintaining an effective penal system here. We pause only to note that contracting out that function may save money for the state's coffers, in addition to the traditional safety, deterrence, retribution, and symbolic rationales trotted out at every round table argument over criminal punishment. Suffice it to

say that it is beyond peradventure that correctional officers working for a private, for-profit corporation that has contracted with the state are serving a public interest by operating Tennessee's prison facilities.

Nonetheless, we also recognize that, while privately employed correctional officers are serving the public interest by maintaining a correctional facility, they are not principally motivated by a desire to further the interests of the public at large. Rather, as employees of a private corporation seeking to maximize profits, correctional officers act, at least in part, out of a desire to maintain the profitability of the corporation for whom they labor, thereby ensuring their own job security.[4] While this arguably does not vitiate furtherance of the public interest, it upsets the balance qualified immunity seeks to establish "between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt*, 504 U.S. at 167, 112 S.Ct. at 1833 (citation omitted). The balance struck by qualified immunity, at least implicitly, contemplates a government actor acting for the good of the state, not a private actor acting for the good of the pocketbook. With respect to cutting corners on constitutional guarantees, one commentator has explained that "[e]ntrepreneurial jailers benefit directly, in the form of increased profits, from every dime not spent." Note, *The Panopticon Revisited: The Problem of Monitoring Private Prisons*, 96 Yale L.J. 353, 357 (1986).

We believe this increased threat of injury by violation of constitutional guarantees counsels against granting qualified immunity to correctional officers employed by a private corporation to run a state's prison facilities. Because private corporations operating correctional facilities are not "principally concerned with enhancing the public good," *Wyatt*, 504 U.S. at 168, 112 S.Ct. at 1833, the appropriate balance between the vindication of constitutional guarantees and the furtherance of the public interest cannot be struck by a liability rule which assumes as its starting point a public employee acting primarily for the benefit of the public. To maintain this balance, the liability rule must adjust, and we believe the rule falls somewhere short of qualified immunity for these privately employed officers.

To be sure, our refusal to grant qualified immunity to private corrections officers will result in increased litigation costs, which may ultimately be passed on to the state in form of an increased contract price. However, the public interest in minimizing the costs of maintaining efficient, workable prison systems is not necessarily at odds with this result. This increased litigation cost may be offset, at least partially, by the reduced administrative costs associated with monitoring the private correctional facilities to ensure compliance with constitutional rights. To the extent that private enforcement through section 1983 acts as an effective monitor of private correctional corporations, states will realize reduced administrative monitoring costs because the threat of liability (and therefore reduced profits) will force the private actor to internalize the monitoring costs otherwise borne by the state. In short, the state may pay more to obtain private correctional services, but less to monitor them on an ongoing basis.

Further, the denial of qualified immunity here will not deter talented candidates from entering public service, another of the major concerns undergirding qualified immunity doctrine. *See e.g., Wood v. Strickland*, 420 U.S. 308, 320, 95 S.Ct. 992, 999–1000, 43 L.Ed.2d 214 (1975) (stating that the "most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources from monetary liability were a likely prospect during their tenure"). We make two comments on this issue. First, the simple fact is that correctional officers, privately employed by a corporation contracting with the state, are not in "public" service, although they are performing a service that

---

4. We do not seek by implication to question the actions or intent of these defendants. Rather, we are simply pointing out that for-profit corporations—and indirectly the employees of those corporations—seek to realize what the name implies, a profit. Accordingly, private corporations running correctional facilities have a greater incentive to cut costs by infringing upon the constitutional rights of prisoners in order to ensure the profitability of the enterprise.

undoubtedly benefits the public interest. The motivations for entering the field undeniably differ from those prompting, for example, a run for public office, which rarely is undertaken for financial reasons. Rather, the spur in the flank of private correctional corporations is, of course, the profitability of the enterprise. The denial of qualified immunity will not deter qualified firms from contracting with the state to manage correctional facilities. Instead, firms simply will take account of this fact when analyzing the corporate balance sheet, and contract with the state accordingly. As long as a profit can be realized from the venture, we have no fear that denying qualified immunity to these defendants will result in a dearth of qualified applicants seeking entry into the field. ·

In sum, we disagree somewhat with the approach taken by several other circuits, which simply asks whether the private actor is performing a traditional governmental function (often, as is the case here, because the state has decided to "privatize" that function by contracting it out), and if so, extends immunity's protective cloak to cover the private actors. As we only recently explained, "the rationale for granting qualified immunity to public officials—that they [will] act decisively in their jobs for the public good without fear of being sued—[does] not apply with equal force to private parties acting for their own ends." *Vector Research*, 76 F.3d at 699 (citation omitted). Under our analysis, we would perhaps reach a similar result via a slightly different route if confronted with facts similar to some of the cases from our sister circuits discussed above. However, in the case before us, we believe the public policy underpinnings of qualified immunity—which strike a balance between compensation for constitutional injury and the public interest in effective government—do not apply with equal force to acts undertaken by employees of a private, for-profit corporation. We therefore refuse to grant qualified immunity to correctional officers employed by a private corporation to maintain prison facilities for the state.

It may be that the appropriate balance to be struck here is to permit the correctional officers to assert a good faith defense, rather than qualified immunity. *See Vector Research*, 76 F.3d at 699 (allowing attorneys to assert a good faith defense to Bivens claim); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1276–77 (3d Cir.1994) (allowing good faith defense to section 1983 claim); *Duncan*, 844 F.2d at 1267–68 (same). However, that issue is not before this Court in this interlocutory appeal. We leave that issue for another day, hold only that correctional officers employed by private, for profit corporations in contract with the state are not entitled to qualified immunity.

The judgment of the district court is AFFIRMED.

DAVID A. NELSON, Circuit Judge, concurring in the judgment.

If I believed that we were free to dispose of this appeal on public policy grounds, my vote would be to remand the case with instructions to dismiss it should the district court conclude that the conduct of the defendant correctional officers could reasonably have been thought consistent with the constitutional rights the officers are alleged to have violated. The notion that there is likely to be a meaningful difference between the behavior of a correctional officer whose paycheck comes from the State of Tennessee and the behavior of a correctional officer whose paycheck comes from the Corrections Corporation of America is a notion, it seems to me, that bespeaks a vaguely utopian view of the virtues of those who feed at the public trough. This view is not one I share. If it is sound public policy to offer qualified immunity from suit to the correctional officer employed by a public corporation, I think it is equally sound policy to offer qualified immunity to the officer employed by a private corporation, assuming both employees perform identical functions for identical reasons.

As a matter of circuit precedent, however, I believe that this panel is foreclosed from following the course to which my own view of public policy might point. In *Duncan v. Peck*, 844 F.2d 1261 (6th Cir.1988), as the Supreme Court has recognized, "[t]he Sixth Circuit ... rejected qualified immunity for private defendants sued under § 1983 but ... established a good faith defense." *Wyatt*

*v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992).

In rejecting qualified immunity for private parties, the *Duncan* panel applied a two-part test:

> "The first part requires the party claiming immunity to show that the immunity was recognized at common law. The second part requires a showing of strong public policy reasons for granting such an immunity." *Duncan,* 844 F.2d at 1264 (footnote omitted).

The holding of *Duncan* was stated by the panel as follows:

> "Because we find no evidence that private parties were immune from suit at common law, and because the various rationales for good faith immunity are inapplicable to private parties, *we hold that private parties are not eligible for immunity from suit."* *Id.* (Emphasis supplied.)

This holding may be too broad, but I believe that our circuit precedent rule makes it binding on us here. It is true that where public officials are concerned, the Supreme Court has disclaimed any "suggest[ion] that the precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law." *Anderson v. Creighton,* 483 U.S. 635, 645, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987). As *Anderson* went on to say, "[t]hat notion is plainly contradicted by *Harlow* [*v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ], where the Court completely reformulated qualified immunity along principles not at all embodied in the common law...." *Id.* But the Supreme Court decided *Anderson* well before this court decided *Duncan,* so *Anderson* does not relieve us of the obligation to follow *Duncan.* And the two decisions are not inconsistent in any event, *Duncan* having involved private parties and *Anderson* having involved an agent of the Federal Bureau of Investigation.

Neither, of course, does the Supreme Court's subsequent decision in *Wyatt* relieve us of the obligation to follow *Duncan.* The *Wyatt* Court pointed out that the Sixth Circuit's blanket rejection of qualified immunity for private defendants conflicts with other circuits' recognition of such immunity under certain circumstances, but *Wyatt* did not resolve the conflict. In the post-*Wyatt* era, I imagine, most of our sister circuits will probably continue to make qualified immunity available to private defendants who perform governmental functions for governmental purposes. Several circuits have already done so—see, *e.g., Williams v. O'Leary,* 55 F.3d 320 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 527, 133 L.Ed.2d 434 (1995) (private physicians whose employer held contract with state prison system to provide medical services for inmates could assert qualified immunity); *Warner v. Grand County,* 57 F.3d 962 (10th Cir.1995) (director of a private "crisis center" who performed body cavity search at sheriff's request entitled to qualified immunity); *Leeks v. Cunningham,* 997 F.2d 1330 (11th Cir.), *cert. denied,* 510 U.S. 1014, 114 S.Ct. 609, 126 L.Ed.2d 573 (1993) (private physician providing medical services under contract with county jail entitled to qualified immunity). Given *Duncan,* however, I do not believe that the qualified immunity option is currently open to our panel.

Except insofar as to the right to an interlocutory appeal is concerned, the courts' increasingly benign attitude toward summary judgment proceedings may frequently mean that there will be little practical difference between the good faith defense that was recognized in *Duncan* and the qualified immunity "defense" (arguably a misnomer, see *Duncan,* 844 F.2d at 1265) recognized by our sister circuits. The good faith defense is not before us now, however, and I intimate no view as to whether the defendants can prevail on such a defense under the facts of this case.

For the reasons stated, I concur in the affirmance of the district court's denial of qualified immunity.