NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0324n.06

Case No. 22-1596

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| CARDELL SANDERS, JR., | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| GENESEE COUNTY, MICHIGAN; PAUL WALLACE; JAY PARKER; JOE LEE; JOHN DOE 1; JOHN DOE 2; SHANA MCCALLUM; SEAN POOLE; CHARTER TOWNSHIP OF FLINT, MICHIGAN; LACEY LOPEZ; DAVID S. LEYTON; JANET MCLAREN, | ) | OPINION |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, COLE, and NALBANDIAN, Circuit Judges.

COLE, Circuit Judge. Police were dispatched to Cardell Sanders, Jr.'s house after receiving a call that dogs were left outdoors in extreme heat without drinking water. Upon seeing the conditions in which the five dogs were kept, police seized Sanders's dogs. Sanders sued Genesee County, the Charter Township of Flint, and various individuals, alleging violations of the Fourth, First, and Fourteenth Amendments and municipal liability under 42 U.S.C. § 1983 and conversion under Michigan state law. Sanders appeals the district court's grant of summary judgment in favor of the defendants on all counts. Because the defendants are entitled to qualified immunity and there is no genuine dispute of material fact, we affirm.

Case No. 22-1596, *Sanders v. Genesee County, et. al.*

## I. BACKGROUND

**A. Facts**

On a hot day in July 2020, at 3:34 p.m., Genesee County Sheriff's Department received a call from an individual reporting that there were three dogs left outside in the yard at 2582 Bertha Avenue without water. The office dispatched Flint Township Officers Shana McCallum and Shawn Poole to the scene. McCallum was already aware of this address because the Genesee County Sheriff's Department, Flint Township Police, and Genesee County Animal Control had received at least ten calls regarding potential dog fighting, abuse, neglect, noise, and blight conditions at that address.

McCallum and Poole arrived at the property at around 4:02 p.m. Poole knocked on the front door to determine whether Sanders was home. When no one came to the door, McCallum went into a neighbor's yard to look into Sanders's yard. McCallum and Poole determined that the five dogs there had to be removed from the unsafe conditions and entered Sanders's yard without a warrant.

In the yard, McCallum witnessed the following: two of the five dogs were secured to a fence on short chains and not near any shelter; there were various pots and pans throughout the yard, filled with old and spoiled food and dirty, bug-infested water; there were piles of spoiled dog food on the ground covered in dirt and flies; there were piles of dog feces scattered around; rusty nails were found in the middle of the yard; and there was trash all over, such that McCallum could smell the stench of garbage in the heat while approaching the backyard from the driveway. The lack of water and appropriate shelter particularly concerned McCallum because at 4:15 p.m., the temperature was 94 degrees Fahrenheit, with heat index values of up to 100 degrees Fahrenheit that day.

Because the dogs appeared aggressive toward the officers, McCallum and Poole contacted Genesee County Animal Control and requested they send someone to assist the officers. At 4:35 p.m., an hour after the initial 911 call, Officer Joe Lee from Animal Control arrived at the scene. Lee successfully removed two of the dogs and placed them in the Animal Control car.

While Lee was transferring a third dog into the car, Sanders returned home and responded by angrily asking the officers what they were doing and why they were trespassing on his property. He yelled at the officers several times, announcing that "y'all aren't taking my dogs." When the officers told Sanders about their concerns regarding the heat, lack of shelter, and lack of water, Sanders said the dogs did have water by pointing to a plastic water jug on the driveway, out of the dogs' reach from the backyard. He also poured water into a dirty bowl next to one of the dogs.

McCallum said that at one point, Sanders approached one of the large dogs as if to unleash the dog and set the dog loose on the officers. Sanders claims he was approaching the dog to give him to McCallum. In response to this perceived threat, and believing that the dog would charge at the officers, McCallum brandished her firearm. After the officers warned Sanders that the dogs would be shot with a tranquilizer if needed, Sanders calmed down and, after the arrival of additional backup officers, assisted in placing two of the dogs in the Animal Control vehicle. McCallum had her weapon unholstered for about a minute and returned it to its holster when Sanders agreed to help remove the remaining dogs.

The Director of the Genesee County Animal Control, Paul Wallace, then arrived at the scene. He told Sanders why the dogs were removed and the various issues with the conditions in which the dogs were kept. Sanders was told that the dogs would be kept with Animal Control until prosecutors determined whether to bring criminal charges against Sanders. While in Animal Control custody, all five dogs were diagnosed with heartworm, which had gone untreated for at

least four months. Four of the dogs were treated for the disease; the fifth dog had such a progressed form of heartworm that Michigan State veterinarians determined euthanasia was the only treatment for the dog.

In the meantime, Detective Jacey Lopez investigated Sanders for potential criminal charges, and requested a warrant to bring animal cruelty charges against Sanders on July 23, 2020. Genesee County prosecutor Janet McLaren authorized a warrant and criminal complaint against Sanders on July 30, but it was not filed due to an alleged communications issue.

## B. Procedural History

On November 10, 2020, Sanders filed suit against Genesee County; McCallum; Poole; Wallace; Jay Parker, who replaced Wallace as Animal Control Director; Lee; and two John Does, seeking damages on various claims.[1] After Sanders initiated the lawsuit, McLaren learned that the warrant she had authorized had never been filed. Detective Alex Minto, at Lopez's behest, signed and filed the complaint on November 24, and the forfeiture action on December 1. On December 31, Sanders filed an amended complaint which included the First Amendment retaliation claim and added the Charter Township of Flint, as well as the individuals involved with the criminal prosecution—Minto, Lopez, McLaren, and prosecutor David Leyton—as defendants.

After discovery and numerous motions, all parties submitted motions for summary judgment. The district court granted defendants' summary judgment motions and denied Sanders's summary judgment motion. Sanders timely appealed the grant of summary judgment, but not the denial of his own motion.[2]

---

[1] When referring to only a subset of the defendants, Genesee County, Wallace, and Parker are collectively the "Genesee County Defendants," and Flint Charter Township, McCallum, and Lopez are collectively the "Flint Township Defendants." When the generic term "defendants" is used, we are referring to all the defendants in the case.

[2] There are several individuals who are not part of this appeal. The district court dismissed the case as to Leyton and McLaren. *Sanders v. Genesee Cnty.*, No. 20-cv-13014, 2021 WL 3207060, at *5 (E.D. Mich. July 29, 2021).

## II.  ANALYSIS

We review a grant of summary judgment de novo. *Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022).  Summary judgment may only be granted where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

### A.  Fifth Amendment

As a preliminary matter, Sanders challenges the district court's ruling that he could not introduce certain evidence in responding to the motions for summary judgment.  When an individual in a civil case invokes their Fifth Amendment privilege against self-incrimination rather than respond to interrogatories or deposition questions, as Sanders did throughout his deposition, the individual can be barred from "introducing other evidence on *that matter*" on which they invoked their privilege.  *Traficant v. Comm'r*, 884 F.2d 258, 265 (6th Cir. 1989).  But a court can only limit those matters "directly related to the scope of the asserted privilege." *Id.*

Here, we need not wade into precisely when and how Sanders invoked his privilege or whether the district court's scope of preclusion was proper.  Sanders does not present any specific evidence he was barred from presenting in the saummary judgment proceedings, nor did the district court exclude any relevant evidence.  *See id.* ("We need not reverse any actual applications of the Tax Court's bar to Traficant's conduct of his case, however, because Traficant has not shown us any ruling that prevented him from adducing evidence that would have been otherwise admissible.").

---

Sanders has not appealed that decision.  The parties voluntarily stipulated to dismiss the case as to Minto.  The parties also stipulated to dismiss the case as to Poole.  Therefore, Minto, Leyton, McLaren, and Poole are not parties to this appeal.

**B. Section 1983 Claims**

Sanders brings four 42 U.S.C. § 1983 claims against the defendants. "Section 1983 provides a cause of action against any person who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law." *McKnight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996). Qualified immunity acts as an affirmative defense against Section 1983 claims if the government officials' "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We analyze qualified immunity using a two-pronged inquiry: "First, a court must decide whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right," and second, "the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

*1. Fourth Amendment Claims*

Sanders brings two Fourth Amendment claims: unlawful search and seizure and excessive force. Defendants are entitled to summary judgment on both claims.

*Search and seizure—all defendants.* The Fourth Amendment prohibits "unreasonable searches and seizures[.]" U.S. Const. amend. IV. A warrantless search and seizure is "*per se* unreasonable." *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

But there are exceptions to this rule. Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). And when exigent circumstances exist, such

that "a reasonable officer could believe that there are 'real immediate and serious consequences' that would certainly occur were a police officer to 'postpone action to get a warrant,'" a warrantless search is permissible. *Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). "[I]mminent and ongoing danger to the health" of people and animals is considered a serious consequence warranting the application of the exigent-circumstances doctrine. *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 490 (6th Cir. 2014). The plain-view and exigent-circumstances doctrines intersect: exigent circumstances may provide officers with the lawful right of access to an object in plain view. *Id.* at 489–90.

Sanders argues that there were no exigent circumstances allowing for the warrantless seizure of his dogs. But we have held that animals facing imminent danger from heat, lack of water, lack of nutrients, and living amongst squalor such as feces, bugs, and dirty water create an exigent circumstance allowing for the warrantless seizure of the animals. *Id.* at 490; *see also King v. Montgomery Cnty*, 797 F. App'x 949, 952, 955 (6th Cir. 2020) (finding that "dogs liv[ing] in squalor, sometimes without food or water, and oftentimes covered in feces," constituted exigent circumstances). And the conditions in which Sanders's dogs were found certainly align with those we have found endanger the lives of animals and indicate exigent circumstances exist.

Sanders attempts to distinguish *United Pet Supply*, arguing that unlike in the pet store, his dogs were not locked in hot cages without air conditioning overnight, nor were his dogs malnourished, dehydrated, or otherwise lethargic, as shown by their barking during the events of the search and seizure. But this argument misses the forest for the trees. *United Pet Supply* did not stand for the proposition that dogs must be malnourished or lethargic to trigger the exigent-circumstances doctrine; rather, it stood for the proposition that the appearance that the health of

animals is in danger satisfies the requirements of the exigent-circumstances doctrine. It may not have been clear to the officers that Sanders's pets were malnourished or lethargic, but there was a risk to their health due to the extreme outside heat, lack of access to clean water, and the general squalor in which the dogs resided. *See King*, 797 F. App'x at 952. That is enough under our caselaw.

Sanders also argues that even if there were exigent circumstances allowing for the officers to enter his property, any such exigency ended when Sanders arrived back at his home because he was then able to provide the dogs shelter from the heat as well as fresh food and water.

Exigent circumstances certainly do not extend indefinitely, and they "terminate when the factors creating the exigency are negated." *Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 565 (6th Cir. 2006). But "[i]f the dangers persist or increase, the exigent circumstances also persist." *Carlson v. Fewins*, 801 F.3d 668, 674 (6th Cir. 2015).

Sanders's arrival did not alter the circumstances in which the dogs were found. Though he did provide the dogs more water when he arrived, he did so by pouring it into a decrepit and dirty bowl. McCallum testified that once Sanders arrived, she still "had no way to ensure that those dogs would not have been subjected to extreme heat, lack of water and improper shelter at that point," and that the general state of the back yard—with dogs lying on feces and trash—ensured that she "didn't want to prolong that or have that happen again." (McCallum Dep., R. 106-2, PageID 1562.) Sanders has not presented any evidence to point to a genuine dispute of material fact as to whether these conditions materially changed once he arrived, or whether it was unreasonable for McCallum to believe that the dogs remained in danger even after Sanders's arrival. *See King*, 797 F. App'x at 955 ("Whether [McCallum] over-estimated the danger the dogs actually faced is immaterial." (citing *United States v. Brown*, 449 F.3d 741, 750 (6th Cir. 2006))).

Because there were exigent circumstances, the defendants' warrantless search and seizure of Sanders's dogs was not unreasonable, and they are entitled to qualified immunity.

*Excessive Force—Flint Township Defendants.* Sanders also argues that McCallum acted with excessive force during the seizure when she removed her gun from its holster. Lawful seizures can become "unreasonable" within the meaning of the Fourth Amendment when the officer utilizes excessive force. *See Graham v. Connor*, 490 U.S. 386, 394–97 (1989). To determine whether an officer utilized excessive force, we look at the totality of the circumstances, including whether the officers were investigating a serious crime at the time of the seizure, the suspect posed a safety threat, and the suspect was resisting arrest. *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022). And we examine the reasonableness of the use of force from the perspective of a reasonable officer. *Graham*, 490 U.S. at 396.

Sanders concedes that animal cruelty, the crime officers were investigating, is a serious crime. And the last factor is inapplicable here, where Sanders was not arrested. Thus, our totality-of-the-circumstances inquiry rests most heavily on whether a reasonable officer would have feared Sanders's actions at the time McCallum brandished her gun.

Sanders argues that he did not order the dog to attack the officers, nor did he himself threaten the officers. But the testimony in the case portrays a different story. Even before Sanders arrived, the officers were worried about the aggressive nature of the dogs and waited for Animal Control to send assistance. Sanders's testimony aligns with the defendants' testimony: when Sanders arrived, "the dogs was [sic] going crazy," growling and barking at the officers. (Sanders Dep., R. 104-2, PageID 1436.) He invoked his Fifth Amendment privilege when he was asked whether the dogs were jumping on their chains, but he responded "yes" when asked if the dogs were "trying to get at the officers[.]" (*Id.*)

Regardless of whether McCallum's pulling out her gun qualifies as a constitutional violation, "we can begin and end our analysis with the requirement that [Sanders] identify clearly established law." *Gambrel*, 25 F.4th at 401; *see Pearson*, 555 U.S. at 236. Sanders cannot point to any caselaw that says McCallum acted unconstitutionally by drawing her gun when confronted with someone who appeared about to unleash an apparently aggressive dog. The Flint Township Defendants are therefore entitled to qualified immunity.

### 2. *Fourteenth Amendment Claim*

Next, Sanders argues that the defendants violated his Fourteenth Amendment due process rights by failing to provide pre- or post-deprivation hearings. The Fourteenth Amendment bars the government from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. We employ a two-step inquiry when considering procedural due process claims: "We initially determine whether a protected property or liberty interest exists and then determine what procedures are required to protect that interest." *Crosby v. Univ. of Ky*, 863 F.3d 545, 552 (6th Cir. 2017) (quoting *Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990)). Since Sanders has a property interest in his dogs, we proceed to the second step. *See O'Neill v. Louisville/Jefferson Cnty. Metro Gov't*, 662 F.3d 723, 733 (6th Cir. 2011). At the second step, we apply the three-part balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

While typically due process within the meaning of the Fourteenth Amendment requires a hearing prior to the deprivation of property, "the failure to provide a pre-deprivation hearing does not violate due process in situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." *United Pet Supply*, 768 F.3d at 485–86. We face the exact

same due process considerations here as we did in *United Pet Supply*: the same exigent circumstances, and the accompanying fear for the safety of the animals, that excused the officers' warrantless seizure of the dogs resulted in an emergency situation wherein it was reasonable for the officers to seize the animals without first providing the animal owners with a pre-deprivation hearing. *Id.* at 486–87. Defendants therefore did not violate Sanders's procedural due process rights by failing to provide him with a pre-deprivation hearing.

But Sanders argues that the government also did not provide adequate post-deprivation process. "Any constitutional violation 'is not complete unless and until the State fails to provide due process.'" *Hardrick v. City of Detroit*, 876 F.3d 238, 247 (6th Cir. 2017) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). To succeed on this claim, Sanders "need[s] to show that Michigan offers no statutory or common law remedy." *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 534–36 (1984)). In *Hardrick*, we found that Michigan tort law provided a remedy because it allows for recovery for harm to animals and municipal officers are not immune for acts committed with gross negligence. *Id.*

The district court held that Michigan did offer Sanders a remedy under Michigan Court Rule 3.105, which provides procedures for a "Claim and Delivery" action in state court to recover "goods or chattels," such as dogs, "which have been unlawfully taken or unlawfully detained[.]" Sanders argues that this is not an adequate remedy, because in a claim and delivery action he cannot invoke his Fifth Amendment right against self-incrimination, and his testimony from the claim and delivery action can be introduced into the record in a criminal case. But while a claim and delivery action might not be the *ideal* post-deprivation process, the existence of post-deprivation process to recover his dogs is sufficient to meet the Fourteenth Amendment's procedural due process guarantees because it shows there *is* an adequate statutory remedy

available. *See Hardrick*, 876 F.3d at 247. Defendants are therefore entitled to qualified immunity on the Fourteenth Amendment claim.

### 3. First Amendment Claim

Sanders also claims that the Flint Township Defendants violated his First Amendment rights when they initiated a criminal case for animal cruelty against him in retaliation for the filing of the instant lawsuit. Under the First Amendment, government officials may not subject an individual, like Sanders, to retaliatory actions when the individual engages in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To establish a retaliation claim, Sanders must show that (1) he was engaged in a constitutionally protected activity; (2) that the adverse action, here, the criminal complaint, "caused [Sanders] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights." *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). The temporal proximity between the protected conduct and the adverse action can provide circumstantial evidence of retaliatory motive. *Hill v. Lappin*, 630 F.3d 468, 475–76 (6th Cir. 2010). But we have not found that temporal proximity alone can establish retaliatory motive. *Id.* at 476.

First Amendment retaliation claims are analyzed under a burden-shifting framework. *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc) (per curiam). Once the plaintiff establishes their prima facie case, the burden shifts to the defendant, and "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*; *see also Wenk v. O'Reilly*, 783 F.3d 585, 593–94 (6th Cir. 2015).

The district court found that there was no retaliatory action because the defendants presented sufficient evidence to show that they had been exploring criminal charges against Sanders nearly three months prior to the filing of the instant lawsuit. Sanders disagrees, arguing that the district court ignored the reality that there are differences between exploring criminal charges and initiating them, and that defendants' arguments as to why there was a delay between the authorization of the warrant and the filing of the warrant are unpersuasive.

But Sanders does not cite any caselaw for the distinction between exploring and filing criminal charges, nor does he provide any evidence that casts doubt on defendants' explanations. Lopez testified that she never intended to drop the case against Sanders once she sought the warrant in July, and that she had never received the authorization materials from McLaren. McLaren likewise testified that she initially signed off on charging Sanders months before the criminal complaint against him was filed.

The Flint Township Defendants have therefore shown that they would have taken the same action in the absence of the protected activity, defeating Sanders's retaliation claim. *See Wenk*, 783 F.3d at 593–94.

*4. Municipal Liability*

Sanders's fourth and final Section 1983 claim states that the township and county are liable for the actions of their officials. Sanders can establish *Monell* liability by pointing to "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Sanders contends that Flint Township is liable under the third and fourth methods. But he is unable

to show any violation of a claimed federal right because there were exigent circumstances allowing for the warrantless seizure of his dogs. Defendants are therefore entitled to summary judgment.

## C. State Law Conversion Claim

Last, Sanders brought a state law conversion claim against the defendants. "[C]onversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015) (cleaned up).

In Michigan, governmental employees are immune from tort liability if they meet three conditions. Mich. Comp. Laws § 691.1407(2). First, the employee must be acting, or reasonably believe they are acting, "within the scope of [their] authority." *Id.* § 691.1407(2)(a). Second, the relevant agency must be "engaged in the exercise or discharge of a governmental function." *Id.* § 691.1407(2)(b). Third, the employee's conduct cannot "amount to gross negligence that is the proximate cause of the injury or damage," where "'gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* § 691.1407(2)(c), (8)(a).

Sanders concedes the first two elements but argues that the defendants were grossly negligent because the "warrantless seizure was reckless" and the dogs were not in imminent harm. (Appellant Br. 69.) But the officers were not grossly negligent when they seized the dogs; they were in fact acting within the constitutional boundaries of the Fourth Amendment because exigent circumstances excused the warrantless seizure. Defendants are therefore entitled to governmental immunity.

## III. CONCLUSION

For the foregoing reasons, we affirm.