Patricia BOWMAN, Plaintiff,

v.

CORRECTIONS CORPORATION OF
AMERICA, et al., Defendants.

No. 3:96:1142.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 21, 2000.

Joseph Howell Johnston, Nashville, TN, John W. Chandler, Jr., Burch, Porter & Johnson, PLLC, Memphis, TN, for Plaintiff.

Tom Anderson, Anderson Law Firm, PLLC, Jackson, TN, Patrick Alan Ruth, Ruth, Howard, Tate & Sowell, Nashville, TN, for Defendants.

### *MEMORANDUM*

HAYNES, District Judge.

Plaintiff, Patricia Bowman, filed this action under 42 U.S.C. § 1983 as the next

friend of Anthony Bowman, her deceased son and his children, Anthony David Bowman Jr. and Jessica Antoinette Bowman, against the defendants: Corrections Corporation of America, ("CCA"); Kevin Myers, warden of CCA's South Central Correctional Facility, ("SCCF"); Robert B. Coble, a physician under contract with CCA; H.T.I. Memorial Hospital, doing business as Nashville Memorial Hospital and Donald Boatwright, a physician with Nashville Memorial Hospital.

The gravamen of the plaintiff's claims for damages and injunctive relief is that the defendants CCA, Myers and Coble violated Anthony Bowman's Eighth Amendment right to adequate medical care for his sickle cell anemia by Dr. Coble's and Myers' failures to transfer him timely for treatment in a hospital setting by a physician who specializes in the treatment of his condition. Plaintiff asserts that CCA's contract with Coble, particularly Coble's incentive provisions under the contract, motivated Coble's decision to delay Anthony Bowman's transfer. Plaintiff alleges that such failure to provide adequate care resulted in Anthony Bowman's death. Plaintiff also asserted a personal claim of loss of consortium. The plaintiff's negligence claims against the defendants HTI and Boatwright were dismissed. (Docket Entry No. 85). The plaintiff non-suited her loss of consortium claim (Docket Entry No. 276). At trial, plaintiff nonsuited her negligence claims against the defendant Coble.

After more than three years of litigation, this action proceeded to trial and after a two week trial, the jury returned a verdict in favor of the defendants CCA, Myers and Coble. (Docket Entry No. 298). The Court entered judgment for the defendants except as to plaintiff's claim that

CCA's medical policy was unconstitutional under the Eighth Amendment.

Pending before the Court are the plaintiff's motion for leave to interview the members of the jury who agree to be interviewed (Docket Entry No. 307); the plaintiff's motion for judgment as a matter of law or in the alternative for a new trial (Docket Entry No. 308); and the plaintiff's motion for sanctions (Docket Entry No. 321). The defendants have filed responses to these motions. (Docket Entry Nos. 317, 318 and 326 [1]). This Memorandum addresses all post-trial motions.

For the reasons set forth below, the Court denies the plaintiff's motion to interview the jurors. The plaintiff's motion for a new trial is also denied as lacking merit. The plaintiff's motion for judgment as a matter of law is granted in part as to the defendant CCA and denied as to defendants Myers and Coble. The jury's verdict is conclusive on the liability of defendants Myers, Coble and CCA for any damage claims. Yet, the Court concludes, as a matter of law, that on plaintiff's claim for injunctive relief, CCA's medical policy violates CCA's duty under the Eighth Amendment to provide adequate medical care to inmates at SCCF. CCA's medical policy with its exclusive contract for Dr. Coble's services and its extreme financial incentives for Coble poses a significant risk for the denial of necessary medical treatment for inmates at SCCF in violation of the Eighth Amendment.

## A. MOTION TO INTERVIEW JURORS

■ In this motion, plaintiff's counsel seeks to interview any willing juror to respond to inquiries as to the rationale of the jury's verdict. Under Local Rule 12(h)

---

1. In their response, the defendants CCA and Myers, submitted copies of affidavit, but not the originals.

of this Court, the jurors may not be interviewed about their verdict without permission of the Court.

### (h) Post–Verdict Interrogation of Jurors

No attorney, party, or representative of either may interrogate a juror after the verdict has been returned without prior approval of the Court. Approval of the Court shall be sought only by an application made by counsel orally in open court, or upon written motion which states the grounds and the purpose of the interrogation. If a post-verdict interrogation of one or more members of the jury should be approved, the scope of the interrogation and other appropriate limitations upon the interrogation will be determined by the Judge prior to the interrogation.

*Id.*

The Sixth Circuit cited this rule and stated this rule is within "a district court's authority to maintain the integrity of its trial." *United States v. Holloway,* 166 F.3d 1215, 1998 WL 833767, *4 (6th Cir. 1998). On the confidentiality of jury deliberations, Justice Cardozo for the Supreme Court observed that: "freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world," *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 468 77 L.Ed. 993 (1933), with a crime fraud exception inapplicable here. 289 U.S. at 16, 53 S.Ct. 465. The Fifth Circuit observed that "[c]ompelling government interest in the integrity of jury deliberation[s] . . . requires that the privacy of such deliberations and communications dealing with them be preserved." *United States v. Gurney,* 558 F.2d 1202, 1210–11 (5th Cir.1977). Moreover, the Sixth Circuit upheld this Court's denial of a post-verdict interrogation of jurors "to prevent expeditions in search of information with which to impeach jury verdicts." *Tschira v. Willingham,* 135 F.3d 1077, 1089 (6th Cir.1998).

After the jury returned its verdict, the Court polled each of the jurors to ensure that the verdict represented the verdict of each juror. At that time, the Court also inquired of counsel whether there were any other matters concerning the jurors or the verdict. Neither counsel requested any further inquiry and the jurors were excused.

To allow the jurors to be interviewed for the reasons stated in this motion would apply to virtually any case. To allow juror interviews, for the reasons stated, would eviscerate Local Rule 12(h)(5). Moreover, jurors are judges of the facts and after jurors render their verdict, they should not be subjected to further inquiry as to the rationale of their verdict. Such testimony, if obtained, would be inadmissible. See Fed. R. Evid 606(b). Moreover, any inquiry unsupervised by the Court could lead to tainting of these jurors by inquiries detrimental to parties in other cases in this Court, including those cases in which these defendants are parties. Plaintiff's counsel was given an opportunity to make any inquiry of the jury after the jury returned its verdict, but elected not to do so.

For these reasons, the Court denies the plaintiff's motion for leave to interview the jurors for the trial of this case.

### B. PLAINTIFF'S MOTION FOR A NEW TRIAL

█ Plaintiff's motion for a new trial is premised upon the following grounds: (1) that the verdict is contrary to the clear weight of the evidence; (2) that the jury considered testimony that the Court struck as a discovery sanction; (3) that the Court erred in allowing the defendant Coble to have separate peremptory strikes from the defendants CCA and Myers; (4) that the Court erred in excluding the expert testi-

mony of Father John Paris, a medical ethics expert; (5) that the Court erred in allowing the defendants to present four medical experts; (6) that the Court erred in allowing the defendant Myers to testify contrary to his admission about a telephone call from the Commissioner of the Tennessee Department of Corrections; and (7) that the Court erred in not accepting the plaintiff's proposed verdict form.

■ As to the sufficiency of the evidence, on a motion for new trial, the Court is to decide if the jury reasonably reached the verdict based upon the evidence, *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 798 (6th Cir.1996). A trial court cannot substitute its judgment on credibility for the jury's determinations. *Anderson v. Conwood Co.*, 34 F.Supp.2d 650, 653 (W.D.Tenn.1999).

Although the plaintiff submitted sufficient proof upon which to support a judgment on her Eighth Amendment claims against the defendants, the defendants' proof included the testimony of two physicians, who were familiar with the treatment of sickle cell anemia, Dr. John Flexner and Dr. Frank Thomas. Both of these physicians testified that Dr. Coble's treatment of Anthony Bowman was appropriate. With this testimony, the jury could reasonably conclude that Coble was not deliberately indifferent. If Coble provided appropriate medical care, then the jury could reasonably conclude that the defendant Myers, who testified that he relied primarily upon Dr. Coble for the appropriate course of medical treatment, also was not deliberately indifferent to Anthony Bowman's medical needs. With these two experts' testimony, the jury could reasonably conclude that Dr. Coble and Myers were not deliberately indifferent in providing medical treatment to Anthony Bowman. The Court reserved for its decision, the claim against CCA on the constitutionality of CCA's medical policy.

Plaintiff cites *Gasperini v. Center for Humanities Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) to contend that this Court can grant a new trial, if the Court believes the verdict is contrary to the weight of the evidence. The testimony of Drs. Flexner and Thomas equalized the weight of the plaintiff's expert proof concerning Dr. Coble's treatment of Anthony Bowman. In such an instance, the Court will not set aside the jury's verdict on the issue of the medical treatment of Anthony Bowman.

■ As to the jury verdict form, this form was reviewed with all counsel's participation. There was no objection to the jury verdict form, just a preference of plaintiff's counsel for his verdict form. For the plaintiff's argument that the verdict form did not allow plaintiff's theory against CCA, the Court notes that the plaintiff's damages claim against CCA, that was decided by the jury, was premised upon their verdict against Coble and Myers. Once plaintiff elected to sue those defendants individually, their conduct or omissions were necessary predicates for CCA's liability for any damages. In *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), the Supreme Court upheld the dismissal of a city and its police commission in "an action for damages" stating that: "[I]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." In *Hancock v. Dodson*, 958 F.2d 1367, 1376 (6th Cir.1992), the Court also observed that "[b]ecause the only city police officer present committed no constitutional violation, the city cannot be liable for failure to train its police officers." Thus, under *Heller* insofar as a claim for damages is concerned, plaintiff's election

to proceed against Coble and Myers for damages required a showing that they were deliberately indifferent before CCA could be liable for damages. There are exceptions to this rule and the Court reserved to itself the issue of whether CCA's medical policy is unconstitutional. As discussed *infra*, plaintiff's prayer for injunctive relief against CCA remains before the Court.

■ Plaintiff's next contention concerns the Court's exclusion of the testimony of Father John Paris, one of her experts. Father John Paris, a medical ethicist, was to testify on the ethical impropriety of the contract between CCA and Dr. Coble. Because Paris was not a physician and his expert report read like a lawyer's brief, the Court concluded that it was inappropriate for him to testify. The Court was concerned that if his testimony were admitted, then there might be ground for reversal in the event of an appeal. The plaintiff already had presented proof by a physician on the medical ethics of this CCA–Coble contract. The Court instructed the jury that the jury could consider testimony about medical ethics, but that evidence about medical ethics alone was not an independent basis for liability of Dr. Coble or CCA. The ethics issue could be considered as a component on whether Coble exercised good medical judgment in his treatment of Anthony Bowman. Father Paris' testimony was cumulative. This contention lacks merit.

■ As to the numbers of experts, the plaintiff called two experts and defendants, excluding Dr. Coble, called four experts. The number of experts arose from the factual and medical issues of whether Anthony Bowman's sickle cell anemia or bacterial infection or pulmonary infection was the cause of his death. The jury was instructed that the number of witnesses for one side was not to be considered in weighing the proof and the jury could find

that the testimony of fewer witnesses on behalf of a party could sustain a verdict for that party. In a decision on whether to limit the number of experts called by a party, the focus is the content of the testimony, not "mere numbers." *Coal Resources, Inc. v. Gulf & Western Inds. Inc.,* 865 F.2d 761, 769 (6th Cir.1989). With this instruction to the jury and the factual disputes on the medical cause(s) of Anthony Bowman's death, the Court concludes that there was not any prejudice concerning the number of expert witnesses who were allowed to testify for the defendants.

■ The plaintiff next contends that the Court should have restricted the number of the defendants' peremptory challenges to the jury panel so as to give all defendants a total of three peremptory strikes. At the final pretrial conference and at trial, plaintiff's counsel repeatedly asserted that there was some type of Mary Carter agreement between the defendants. The Court repeatedly inquired of defense counsel whether any such agreement existed or if an offer of such an agreement had been made. The response was no. At the final pretrial conference, the Court also placed the defendants' counsel under an affirmative and continuing duty to disclose any such agreement or offer of an agreement among the defendants for the payment of damages. At the *voir dire*, the Court again inquired if there were any such agreement between the parties and defense counsel for CCA, Myers and Coble affirmatively stated that Dr. Coble would be individually liable for any damages imposed upon him. Later, the Court allowed plaintiff's counsel to examine Dr. Coble under oath concerning any such agreement or offer of an agreement. There was not any proof of any such agreement. The defendants were not allowed to consult on the exercise of their peremptory challenges. In fact, the defendants' total per-

emptory strikes were five. Finally, during the Court's consideration of the declaration of a mistrial, plaintiff's counsel objected and insisted that the parties had "good jury". The Court concludes that there was not any prejudice in allowing Dr. Coble, who would be individually liable for any judgment against him, to exercise separately the three peremptory challenges permitted him under 28 U.S.C. § 1870.

■ As to plaintiff's contention that the jury considered evidence excluded by the Court, at trial, the Court found that the defendants failed to supplement specific interrogatories concerning the number of referrals that Dr. Coble made to medical specialists after his contract with CCA. In addition, the Court found that the defendants failed to present proof to dispute the plaintiff's motion for summary judgment that relied upon those earlier discovery answers concerning the number of Dr. Coble's referrals to medical specialists after the CCA–Coble contract.

With the defendants' failures to supplement and to dispute this factual issue in response to the plaintiff's motion for summary judgment, the Court concluded that there would not be any testimony contrary to the defendants' prior discovery responses on these referrals. After conference with counsel, the Court limited the proposed testimony of Linda Rochelle, the assistant warden at SCCF, who was presented to testify about the number of referrals in the monthly health service's report prepared by the SCCF staff. The plaintiff's counsel was allowed to argue his theory concerning the proof on the number of Dr. Coble's referrals to medical specialists. It must be noted that the Court did not exclude all of Linda Rochelle's testimony, only that portion of her testimony concerning changes in the number of Dr. Coble's referrals to medical specialists at SCCF.

To be sure, during its deliberation, the jury requested the testimony of the defendant Myers and Linda Rochelle, or in the alternative, a video of the testimony of Linda Rochelle who testified at trial in person and by video. The Court declined the production of the requested testimony and instructed the jury that they must consider all of the testimony and not focus on the testimony of a particular witness.

Given the Court's limiting instruction to the jury and pretrial exclusion of portions of Rochelle's testimony, the Court does not find error in the jury's request for other portions of Linda Rochelle testimony nor does the jury's request reflect that the jurors considered any excluded testimony.

■ Finally, plaintiff contends that defendant Myers testified contrary to his response to a request for admission that Donal Campbell, TDOC Commissioner, called him about Anthony Bowman's medical condition. The Court ruled that Myers was bound by his response to the specific request for admission and so instructed the jury. At trial, Myers testified that if Campbell stated that he called Myers, then Myers does not dispute Campbell's statement, but did not recall the specific conversation. The jury was to decide any credibility issues in accord with the Court's instruction arising from the testimony by Myers and his response to the request for admission on the issue. This contention lacks merit.

## C. PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW

As to the motion for judgment as a matter of law, the Court reserved whether the contract between CCA and Dr. Coble for the provision of medical services to inmates at SCCF violated the Eighth Amendment. Issues of constitutional law

are questions of law for the Court, not the jury.

■ Whether the contract is unconstitutional on its face and in light of undisputed facts, presents a question of constitutional law that is to be decided by the Court. See *Elrod v. Burns*, 427 U.S. 347, 352, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("[A] question of constitutional interpretation, [is] a function ultimately the responsibility of the Court."); *Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 657, 659–60, 55 S.Ct. 890, 79 L.Ed. 1636 (1935) ("Issues of law are to be resolved by the Court ... At common law there was a well established practice of reserving questions of law arising during trials by jury and of taking verdicts subject to the ultimate ruling on the questions reserved..."); *Rhea v. Massey–Ferguson, Inc.*, 767 F.2d 266, 268 (6th Cir.1985) ("At the core of these fundamental elements is the right to have a jury ultimately determine the issues of fact if they cannot be settled by the parties or determined as a matter of law.") (citations omitted); *Winslow v. Lehr*, 646 F.Supp. 242, 244 (D.Colo.1986).

■ Here, the jury decided only plaintiff's damages claim on whether CCA's medical policy and/or lack of supervision of Dr. Coble was the proximate cause of the defendants Coble and Myers' treatment of Anthony Bowman, the deceased. The jury's finding on the proximate cause is conclusive as to defendants CCA, Myers and Coble on the damages claim. Yet, it is for the Court to decide if CCA's medical policy is unconstitutional for plaintiff's claim of injunctive relief.[2]

## 1. FINDINGS OF FACT[3]

In 1991, CCA entered into a contract with the State of Tennessee acting through TDOC to house state prisoners at CCA facilities, including SCCF. As part of the contract process, CCA estimated its non-personnel medical expenses for the treatment of prisoners. This expense category includes hospitalizations, referrals to medical specialists, prescription drugs and laboratory tests. CCA's initial projection was $500,000 per year for these expenses. Yet, during 1992, 1993 and 1994 CCA's actual expenses for these services and products exceeded $1,000,000. In response to these increased costs, CCA negotiated a contract with Dr. Coble to be the exclusive provider of medical services at SCCF. (Docket Entry No. 10). Dr. Coble was, among other things, to "determine the existence of medical emergencies." *Id.* at p. 2.

In effect, this contract that was executed in October, 1994, created a managed health-care system at SCCF. Dr. Coble's compensation was structured to receive a base salary, but Dr. Coble also had financial incentives that would increase his compensation by $95,000 per year. In pertinent part, these financial incentives are as follows:

## B. CAPITATION PAYMENTS

2. In light of Anthony Bowman's death, it is clearly arguable that any claim for injunctive relief is moot. Yet, exceptions arise for the type of important legal issue that is "capable of repetition, yet evading judicial review," *Kremens v. Bartley*, 431 U.S. 119, 133, 97 S.Ct. 1709, 1717, 52 L.Ed.2d 184 (1977), or involves a class action. *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Here, this is a rare case in which a prisoner is represented by counsel on a constitutional issue of the dimensions raised here. Moreover, although this is nominally not a class action, there was class type proof introduced on the effects and impact of CCA's medical policy. Given the extensive resources devoted to this litigation, the Court concludes that this case represents exceptional circumstances that warrant consideration of the constitutionality of this important medical policy that continues to operate at SCCF.

3. These facts are undisputed.

1. On or before the 15th of each month, CCA shall pay for the prior month an amount equal to the applicable monthly capitation rate adjusted for Copayments as shown below for each Participant in Physician's Panel. THE CAPITATION PAYMENT SHALL BE COMPENSATION FOR ALL PRIMARY CARE COVERED SERVICES PROVIDED TO INMATES.

| Category (Non–Medicare) | Amount |
| --- | --- |
| All Male | $9.40 |

2. Any amendment of capitation rates, whether on an annual basis or upon changes in services required shall be in accordance with the Amendment provisions of this Agreement.

3. For the physician's capitated population of Inmates a budget amount of *$2.43* has been received as part of per diem from the state of Tennessee.

Current non-personnel expenses are *$3.07* per man-day. CCA shall withhold 20% of capitated payments and physician will receive distribution of his withhold as well as any excess on a semi-annual basis. Calculation of distribution is as follows:

| Man-day non-personnel costs | Distribution |
| --- | --- |
| $3.07 | 0 |
| 2.77–3.06 | proportionate return of withhold |
| 2.47–2.76 | 15% distribution to physician |
| 2.17–2.46 | 25% distribution to physician |

*Id.* at p. 2.

In addition, CCA's non-personnel expenses for medical services also increased when in September, 1995 TDOC began to charge CCA for the prisoners whom CCA sent to the DeBerry Correctional Institute, Special Needs Facilities ("SNF") for medical treatment. (Plaintiff Exhibit No. 12). Under this TDOC policy, for in-patient hospital services that are approved by SNF's Medical Director, CCA's liability had a ceiling of $4,000.00. *Id.*

At the time of this contract CCA's non-personnel medical cost was $3.07 per inmate. (Plaintiff's Exhibit No. 10). In October, 1994, the medical cost estimated by the Tennessee Department of Corrections for nonpersonal medical care benefits to CCA for these services was $2.43 per inmate. Plaintiffs' Exhibit No. 10 at p. 2. The documentary proof on the reductions of these costs for the years after this contract varies. Compare Plaintiff's Exhibit Nos. 8 and 9. By June 1995, CCA 's non-personnel medical expenses were reduced to $1.46 per inmate per day. Plaintiff Exhibit No. 8. By February, 1997 these expenses were reduced to $1.48 per inmate. *Id.*

## 2. CONCLUSIONS OF LAW

▮▮▮▮▮ As a corporate entity, CCA can be held liable for the denial of medical care where the proof establishes that the matter at issue represents a policy, practice or custom of CCA, *Street v. Corrections Corp. of America,* 102 F.3d 810, 817 (6th Cir.1996), and for section 1983 liability purposes, CCA is treated as a municipal corporation.[4] The Supreme Court has defined policy as "formal rules or understanding ... that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The Court concludes that the contract between CCA and Coble constitutes a policy for § 1983 analysis as this CCA contract reflects a

---

4. Moreover, as with a municipal entity, CCA is not entitled to qualified immunity. *McKnight v. Rees,* 88 F.3d 417, 427 (6th Cir. 1996) *aff'd, Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997).

written understanding for a fixed plan to provide medical care for inmates at SCCF.

In *Board of County Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Court addressed a county's liability for its Sheriff's isolated decision to hire a relative without determining the relative's qualifications for the position. In addressing the County's liability, the Court surveyed the different legal theories [5] under which a municipality or county can be held liable in a § 1983 action: (1) where the municipal policy itself allegedly violates the Constitution; (2) where the effect of the municipal policy or practice causes an employee to violate a citizen's right; (3) where an authorized decisionmaker for the municipality makes a decision on behalf of the municipality that deprived a citizen of a federal right; and (4) where a municipal employee deprives a plaintiff of a federal right and the violation is traceable to an inadequate municipal policy that reflects the municipality's deliberate indifference or conscious disregard for the consequences of its policy. *Id.* at 404–05, 117 S.Ct. 1382.

As to the first theory of liability, in *Bryan County*, the Supreme Court explained that if a municipal policy is unconstitutional on its face, such a conclusion will usually establish the proximate cause of the plaintiff's injury.

> Where a plaintiff claims that a particular municipality itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state of mind requirement independent of that necessary to state a violation of the underlying federal right ... Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.

*Id.* (citations and quotations omitted).

As to the second theory of municipal liability, "where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Id.* at 405, 117 S.Ct. 1382.

For the third theory, the Court stated, "to the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation." *Id.* These cases involved municipal decisionmakers such as a city, citing counsel or county prosecutor. *Id.* at 406, 117 S.Ct. 1382 (citation omitted). "Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.* at 405, 117 S.Ct. 1382.

A fourth theory exists where a municipal policy is not unlawful on its face, but nonetheless produces constitutional violations that the municipality has consciously disregarded:

> That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and

---

**5.** In his dissent, Justice Breyer noted that the precedent on municipal liability "has generated a body of interpretive law that is so complex that the law has become difficult to apply." *Bryan County*, 520 U.S. at 431, 117 S.Ct. 1382.

causation; the plaintiff will simply have shown that the employee acted culpably.

\* \* \* \* \* \*

a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.

\* \* \* \* \* \*

Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action— the "deliberate indifference"— necessary to trigger municipal liability.

*Id.* at 406–407, 117 S.Ct. 1382 (citing *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Of these theories, the plaintiff asserted two; namely, the first theory that the contract between CCA and Coble with its extreme financial incentives to reduce necessary medical services for inmates, represents an unconstitutional policy of CCA that violates CCA's constitutional obligation under the Eighth Amendment to provide adequate medical care. Plaintiff's second theory is that the effect of the financial incentive provisions in the CCA–Coble contract motivated Coble to delay a transfer of Anthony Bowman to an outside hospital, and the lack of a timely transfer was the proximate cause of his death. The jury decided the second theory on damages and the Court reserved for itself the first issue for plaintiff's injunctive relief claim.

As stated earlier, in *Heller,* the Court found that vindication of an officer's alleged act or omission precludes liability of the municipality on any damages claim.

In *Heller,* the Supreme Court rejected the Ninth Circuit ruling that a claim against a city could survive a jury verdict that its officers were not liable. *Heller,* however, explained that "[b]ut this is an action for damages." 475 U.S. at 799, 106 S.Ct. 1571. In contrast, here, the plaintiff seeks not only damages, but injunctive relief. (Docket Entry No. 16, Amended Complaint, at p. 18). Moreover, as discussed *infra,* on medical policies concerning prisoners, the Court has a separate obligation to determine if the medical policy at issue violates contemporary standards of decency, given that prisoners are completely dependent upon prison officials for their medical care.

Moreover, several Circuits have concluded that there are exceptions to *Heller* on the prerequisite for municipal liability that its officer's acts or omissions must be the predicate for a city's violation of the § 1983 plaintiff's federal rights. The Sixth Circuit in *Doe v. Sullivan County,* 956 F.2d 545 (6th Cir.1992), *cert. denied,* 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992), interpreted *Heller* to create an exception where the individual officer was dismissed on qualified immunity grounds.

*Heller* simply reaffirmed that a determinative issue in § 1983 claims against municipalities is whether the plaintiff has suffered a deprivation of his constitutional rights. To read *Heller* as implying that a municipality is immune from liability regardless of whether the plaintiff suffered a constitutional deprivation simply because an officer was entitled to qualified immunity would, we are convinced, represent a misconstruction of its holding and rationale. See *Newcomb v. City of Troy,* 719 F.Supp. 1408, 1409 (E.D.Mich.1989)(holding that municipality may be liable even where claim is dismissed against officer asserting qualified immunity).

*Id.* at 554; accord *Garner v. Memphis Police Dept.,* 8 F.3d 358, 365 (6th Cir.1993) ("The point in *Heller* was that the city could not be held responsible for a constitutional violation which could have occurred but did not.").

Since *Heller,* other Circuits have found other exceptions that arise where the City's liability is subjected to different legal standards. *Fagan v. City of Vineland,* 22 F.3d 1283, 1292 (3rd Cir.1994) ("a finding of municipal liability does not depend automatically or necessarily on the liability of any police officer who is liable under a standard of conduct that shocks the conscience."). Absent a finding of individual liability on the part of an individual prison official, such as Dr. Coble or Warden Myers, independent municipal liability for a deprivation of life or liberty was found in the following decisions: *Ross v. United States,* 910 F.2d 1422 (7th Cir.1990) (Plaintiff sufficiently pled a Section 1983 claim against a municipality for violating his constitutional right to life as a result of an unconstitutional rescue policy); *Parrish v. Luckie,* 963 F.2d 201, 206–07 (8th Cir.1992) (Concluding that an individual who was not liable in his individual capacity, could be liable in his official capacity so as to impose liability upon the City, his employer); *Hopkins v. Andaya,* 958 F.2d 881, 888 (9th Cir.1992), *cert. denied,* 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995) (City could be liable for improper training/procedure even if the officer is found not liable for excessive use of force); *Rivas v. Freeman,* 940 F.2d 1491 (11th Cir.1991) (County held liable for failure to train despite ruling that the arresting officers' actions were merely negligent).

Given that CCA sets the medical policy for inmates at SCCF and because as discussed *infra,* CCA's liability for its medical policy is measured by a different legal standard than plaintiff's damages claim against Myers and Coble in their individual capacities, the Court concludes that the jury's verdict on Myers and Coble's treatment of Anthony Bowman does not foreclose the Court's consideration of the constitutionality of CCA's medical policy on plaintiff's claim for injunctive relief.

■ The Supreme Court stated the Eighth Amendment standard for a prisoner's right to medical care as follows:

[D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251, 260 (1976) (citation and footnotes omitted).

These standards were explained further by the Supreme Court stating that the action must be characterized as "repugnant to the conscience of mankind." 429 U.S. at 105, 97 S.Ct. 285. The Court of Appeals for this Circuit has stated that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas,* 537 F.2d 857, 860 n. 5 (6th Cir.1976). Yet, "medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Id.*

The reasons for the imposition of this constitutional duty is that a prisoner's custodian is the sole source of medical care for the prisoner.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being .... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment ...."

*Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quoting *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).

■ Clearly, CCA cannot contract away its legal obligations to provide adequate medical care to inmates in its custody. The Court of Appeals has held that prison and jail officials cannot contract away their constitutional duty to provide and to monitor the medical care provided to their prisoners. *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1248–50 (6th Cir.), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990). In *Leach,* the Court of Appeals stated,

[West] indicates that contrary to the Sheriff's contentions, the State (and here the County) retains responsibility despite having contracted out the medical care of its prisoners. Therefore, since the Sheriff is here in his official capacity (and it is effectively the County involved here), the Sheriff is not excused from liability due to having contracted out the medical care.

Finally, the Sheriff's argument in this respect completely ignores the fact that under Tennessee law, whatever may be the personal liability of the medical personnel under *Willis* [*v. Barksdale,* 625 F.Supp. 411 (W.D.Tenn.1985)], the Sheriff still has the responsibility of conforming to at least minimal constitutional standards in providing and maintaining adequate bedding, toiletries and cleanliness. In this case, Leach's sanitary conditions and bedding were deplorable and specific medical care was deplorably deficient. The Sheriff's policy of deliberate indifference to the needs of prisoners like Leach is not excused by a claim of reliance upon the attendant medical staff. Rather, in his official capacity, the Sheriff had a duty to know and to act and his failure to do so in this and other similar cases sufficiently evidences a policy or custom of deliberate indifference sufficient to establish the liability of the County.

*Id.* at 1250 (citing *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)); Accord, *Weeks v. Chaboudy,* 984 F.2d 185 (6th Cir.1993).

By virtue of its contract with TDOC, CCA must provide medical care for state inmates in its control and CCA cannot contract away that responsibility by its agreement with Dr. Coble.

This Eighth Amendment claim has objective and subjective components. In *Helling,* involving a prison's policy on environmental smoke, the Supreme Court defined the objective component and concluded that an inmate is not required to manifest symptoms of a disease before he would be entitled to protection from the policy. 509 U.S. at 32, 113 S.Ct. 2475. The Court then explained that the objective factor for this type of Eighth Amendment claim focuses on the likelihood of exposure to harm.

Also with respect to the objective factor, determining whether [the prisoner's] conditions of confinement violate the Eighth Amendment requires more than

a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. *Id.* at 36, 113 S.Ct. 2475. Significantly, the Court observed: "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Id.* at 33, 113 S.Ct. 2475.

■ This objective element of this Eighth Amendment claim requires a "serious medical" condition. Yet, under *Helling,* there must be a showing of a current harm or that the medical policy "is sure or very likely to cause serious illness and needless suffering." 509 U.S. at 33, 113 S.Ct. 2475. The courts in this Circuit require a showing that the prisoner's medical condition be not only serious, but obvious to correctional officers and requiring immediate medical attention. *Inmates, Washington County Jail v. England,* 516 F.Supp. 132, 139 (E.D.Tenn.1980), *aff'd without op.,* 659 F.2d 1081 (6th Cir.1981). Moreover, other courts have noted that "[a] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977) (citations omitted).

■ Actual physical injury due to indifference is unnecessary. Unnecessary suffering is sufficient for Eighth Amendment purposes. *Boretti v. Wiscomb,* 930 F.2d 1150 (6th Cir.1991) (citing *Estelle,* 429 U.S. at 103, 97 S.Ct. 285). Similarly, the fact of recovery or healing of a wound or injury does not preclude an Eighth Amendment claim. *Id.* In *Boretti,* the fact that a wound healed does not mean that an interruption in a prescribed plan of treatment could not sustain an Eighth Amendment claim even in the absence of an actual injury. *Id.* at 1154. In *Parrish v. Johnson,* 800 F.2d 600, 610–11 (6th Cir. 1986), the Court held that a physical injury was not required in order to state an Eighth Amendment claim for deliberate indifference to a serious medical need. Conduct that causes "severe emotional distress is sufficient." *Id.*

Here, the contract between CCA and Coble governs the referrals of inmates to medical specialists and the decisions to conduct medical laboratory tests and to issue prescription drugs. By definition, these medical services involve the existence of a perceived or actual serious medical condition that is in need of medical treatment or analysis by a medical specialist. Thus, the Court concludes that the proof establishes that CCA's medical policy on non-personnel medical services satisfies the objective component of plaintiff's Eighth Amendment claim on the constitutionality of this contract.

■ As to the subjective element of the deliberate indifference standard, in *Helling,* the Supreme Court stated that:

*On remand, the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct, which may have changed considerably since the judgment of the Court of Appeals. Indeed, the adoption of the smoking policy mentioned above will bear heavily on the inquiry into deliberate indifference. In this respect we note that at oral argument McKinney's counsel was of the view that depending on how the new policy was administered, it could be very*

difficult to demonstrate that prison authorities are ignoring the possible dangers posed by ETS.... The inquiry into this factor also would be an appropriate vehicle to consider arguments regarding to the realities of prison administration.

509 U.S. at 36, 113 S.Ct. 2475 (emphasis added).

In *Weeks v. Chaboudy,* 984 F.2d 185, 187 (6th Cir.1993), the Sixth Circuit noted that "a determination of deliberate indifference does not require proof of intent to harm or a detailed inquiry into his state of mind" as to the facts giving rise to a party's deliberate indifference. Moreover, conscious indifference is not required. *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6th Cir.1988). Yet, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994).

Disagreements between medical personnel on the proper methods of treatment do not give rise to deliberate indifference. *Gibbs v. Norman,* 61 F.3d 903, 1995 WL 411829 (6th Cir.1995); *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir. 1990). Moreover, proof of repeated acts of negligence do not establish deliberate indifference in this Circuit. *Brooks v. Celeste,* 39 F.3d 125, 129 (6th Cir.1994).

Deliberate indifference can also be demonstrated by delays in providing access to medical care or recommended surgery for prisoners which can state an Eighth Amendment violation for deliberate indifference to a serious medical problem. *Byrd v. Wilson,* 701 F.2d 592, 595 (6th Cir.1983) (nine (9) hour delay of medical care after clear notice of obvious medical need held actionable); *Fitzke v. Shappell,* 468 F.2d 1072, 1076 (6th Cir.1972) (nine (9) hour delay after clear notice of obvious medical need by arrestee held actionable

under a due process theory); *Bunton v. Englemyre,* 557 F.Supp. 1 (E.D.Tenn.1981) (Neese, C.J.) (delay of four (4) days in attending to medical needs warranted a denial of summary judgment). See also *Monmouth Co. Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir. 1987), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *West v. Keve,* 571 F.2d 158, 162 (3d Cir.1978) *on remand* 541 F.Supp. 534 (D.Del.1982); *Derrickson v. Keve,* 390 F.Supp. 905, 907 (D.Del.1975); *Dixon v. Dutton,* No. 3:85–0281 (M.D. Tenn. Order filed April 15, 1986, adopting Magistrate Judge's Report and Recommendation).

Yet, the mere fact of delay was deemed not actionable in several cases. See *Bellah v. McGinnis,* 42 F.3d 1388, 1994 WL 664926 (6th Cir.1994) (unpublished); *Foster v. City of Cleveland Heights,* 81 F.3d 160, 1996 WL 132181 (6th Cir.1996) (unpublished); *Van Harris v. Hofbauer,* 73 F.3d 363, 1995 WL 739367 (6th Cir.1995) (unpublished); *Acord v. Brown,* 43 F.3d 1471, 1994 WL 679365 (6th Cir.1994) (unpublished).

As to constitutional policies on medical care, as opposed to decisions involving individual treatment cases, in *Ancata v. Prison Health Services Inc.,* 769 F.2d 700, 702 (11th Cir.1985) the Court considered a county's policy not to refer inmates to a nonstaff medical specialist absent a court order or unless the inmate agreed to pay for the medical services. The Eleventh Circuit concluded that the county's policy requiring indigent inmates who need medical assistance to obtain court orders or to pay for such services and to delay treatment in such instances, could constitute deliberate indifference for which the county may be held liable. *Id.* at 704. "Furthermore, if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been

made out," including where "the defendants put the financial interests of Prison Health Services ahead of the serious medical needs [a prisoner]." *Id.*

Under the first theory of municipal or corporate liability in *Bryan County*, if CCA's contract is itself unconstitutional, then as a general rule, causation would be established. The Court, however, noted that usually in such instances "resolving these issues of fault and causation is straightforward ... the conclusion the action taken ... by the municipality ... itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." 520 U.S. at 404, 405, 117 S.Ct. 1382. The Court also observed that where a municipality's decision itself was unconstitutional, usually "fault and causation were obvious." *Id.* at 406, 117 S.Ct. 1382.

As applied here, given the complexity of the factual issues on Anthony Bowman's medical condition, his personal medical history and the exercise of medical judgment, the Court concludes that it is bound by the jury's determination of the cause and effect of CCA's policy upon Anthony Bowman. To be sure, the jury did not find a causal connection between Coble's treatment of Anthony Bowman, the CCA policy and Anthony Bowman's death. Yet, under *Helling*, for medical policies affecting prisoners, given that prisoners are completely dependent upon prison officials for their medical care, the Court has a separate obligation for injunctive relief to determine if the medical policy at issue would likely expose inmates to harm and if so, whether the policy violates contemporary standards of decency.

While Dr. Coble is a general surgeon with some limited prior experience in psychiatry, the Court questions whether Dr. Coble possesses the range of medical knowledge to decide all medical issues of inmates at SCCF. His earlier referrals to the different medical specialists, before his exclusive contract with CCA, reflect his perceived limits of his medical services. As CCA's medical director, Dr. Fletcher's concerns were primarily financial costs and Dr. Fletcher exercised little meaningful supervision of Dr. Coble's substantive medical decisions. As noted, Dr. Coble has substantial financial incentives to limit medical care.

These financial motivations on the part of CCA's policymakers is exactly the concerns expressed by the Sixth Circuit in *McKnight*.

> ... as employees of a private corporation seeking to maximize profits, correctional officers act, at least in part, out of a desire to maintain the profitability of a corporation for whom they labor, thereby insuring their own job security .... With respect to cutting corners on constitutional guarantees, one commentator has explained that: "entrepreneurial jailers benefit directly, in the form of increased profits, from every dime not spent."

88 F.3d at 424.

■ In assessing issues of whether CCA's policy violates contemporary standards, the Court is required to rely upon objective external factors for its conclusions. *Rhodes v. Chapman*, 452 U.S. 337, 346–47, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). First, the Council on Ethics and Judicial Affairs of the American Medical Association ("AMA") issued a council report that was published on January 25, 1995. This report sets forth ethical standards and considerations on financial incentive provisions in physician contracts in a managed health care program.

> There should be limits on the magnitude of financial incentives, incentives should be calculated according to the practices of a sizable group of physicians rather

than on an individual basis, and incentives based on quality of care rather than cost of care should be used.

\*     \*     \*     \*     \*     \*

The strength of a financial incentive to limit care can be judged by various factors including the percentage of the physicians income placed at risk, the frequency with which incentive payments are calculated, and the size of the group of physicians on which the economic performance is judge.

*If the managed care plan places twenty (20) percent of the physician's income at risk, the physician likely will be much more conscious of costs than if the plan places five (5) percent of income at risk.*

\*     \*     \*     \*     \*     \*

*Similarly, if a physician's incentive payments are based solely on his or her treatment decisions, there is a strong incentive to limit services for each patient. When payments are based on the performance of a group of physicians, on the other hand, the incentive is diminished.*

\*     \*     \*     \*     \*     \*

The strength of a financial incentive can also vary with the frequency of incentive payments. If payments are made on a monthly basis rather than a yearly basis, the physician receives rapid feedback on the economic consequences of treatment decisions and is therefore likely to be more sensitive to those consequences. In addition, when incentives are calculated on a monthly basis, there is less of an opportunity for the costs of cases that are above average to be offset by the costs of cases that are below average. Accordingly there is a stronger incentive not to incur unusually high expenses in any one case.

\*     \*     \*     \*     \*     \*

Because measurements of quality are still in the rudimentary stages of development, it is important to ensure that other safeguards are in place to prevent abuse from incentives based on quantity of care. Reasonable limits should be placed on the extent to which a physician's ordering or services can affect his or her income. For example, quantitative financial incentives should be calculated on groups of physicians rather than individual physicians.

\*     \*     \*     \*     \*     \*

3. When physicians are employed or reimbursed by managed care plans that offer financial incentives to limit care, serious potential conflicts are created between the physicians' personal financial interests and the needs of their patients. Efforts to contain health care costs should not place patient welfare at risk. Thus, financial incentives are permissible only if they promote the cost-effective delivery of health care and not the withholding of medically necessary care.

Journal of the American Medical Association Vol. 273 No. 4 at pp. 333, 334, 335 (1995) (emphasis added).

Under regulations governing medical services in the Medicare program, there are regulatory limits and prohibitions on financial incentives to physicians in a managed care plan. Under 42 C.F.R. § 417.479 of the Medicare regulations, agreements with financial incentives in physician services contracts, are defined as follows:

Physician incentive plan means any compensation arrangement between an HMO or CMP and a physician or physician group that may directly or indirectly have the effect of reducing or limiting services furnished to Medicare beneficiaries or Medicaid recipients enrolled in the HMO or CMP.

Section 417.479(c). Moreover, as pertinent here, Medicare regulations define referrals to include the non-personnel medical ser-

vices at issue here: "Referral services means any specialty, inpatient, outpatient, or laboratory services that a physician or physician group orders or arranges, but does not furnish directly." *Id.*

Medicare also imposes specific prohibitions and limitations on financial incentives in such contracts. There is a general prohibition on payments to covered physicians.

(d) *Prohibited physician payments.* No specific payments of any kind may be made directly or indirectly under the incentive plan to a physician or physician group as an inducement to reduce or limit covered medically necessary services covered under the HMO's or CMP's contracts furnished to an individual enrollee. Indirect payments include offerings of monetary value (such as stock options or waivers of debt) measured in the present or future.

42 C.F.R. § 417.479(d).

Under these Medical regulations, there are express limitations on capitation arrangements as well as other limitations on a physician's exposure to financial risk.

(e) *General rule: Determination of substantial financial risk.* Substantial financial risk occurs when the incentive arrangements place the physician or physician group at risk for amounts beyond the risk threshold, if the risk is based on the use or costs of referral services. Amounts at risk based solely on facts other than a physician's or physician group's referral levels do not contribute to the determination of substantial financial risk. *The risk threshold is 25 percent.*

\* \* \* \* \* \*

(f) Arrangements that cause substantial financial risk.

(5) Capitation arrangements, if—

(i) The difference between the maximum potential payments and the minimum potential payments is more than 25 percent of the maximum potential payments; or

(ii) The maximum and minimum potential payments are not clearly explained in the physician's or physician group's contract.

(6) Any other incentive arrangements that have the potential to hold a physician or physician group liable for more than 25 percent of potential payments.

42 C.F.R. 417.479(e) and (f)(5)(6) (emphasis added).

Applying these professional medical standards, CCA's contract permits Dr. Coble effectively to double his income under the contract, that is clearly at variance with these medical standards. CCA's contract with Dr. Coble also exceeds the salient level of financial risk (25%) to Dr. Coble than is deemed appropriate by AMA and federal regulatory standards for physicians. Moreover, the financial incentives are based on the performance of one physician, as opposed to a group or groups of physicians, contrary to the AMA standards. The monthly payments to Dr. Coble heighten the impact of the financial incentives upon Dr. Coble's compensation, as the AMA report predicted. Applying federal Medicare standards, CCA's contract exceeds the acceptable risk threshold of 25 percent by almost twofold.

By correctional standards, TDOC set higher cost requirements for these services than were expended under CCA's contract. At the time of the execution of this contract, the Tennessee Department of Corrections estimated that it would cost $2.43 per inmate for CCA to provide non-personnel medical services to inmates at SCCF. (Plaintiff's Exhibit No. 10). Through its contract with Dr. Coble, CCA has lowered these medical costs to $1.48 per inmate at SCCF. (Plaintiff's Exhibit No. 8). In addition, the undisputed facts reflect a reduction in CCA's prescription

drug costs from $108,751 in 1994 to $74,660 in 1997, despite an increase of 170 inmates at SCCF. (Plaintiff's Exhibit No. 21).

With these collective medical, legal and correctional standards applicable to non-personnel medical services, this Court concludes that CCA's medical policy at SCCF, as represented by its contract with Dr. Coble, violates contemporary standards of decency, by giving a physician who provides exclusive medical services to inmates, substantial financial incentives to double his income by reducing inmates' necessary medical services. Under this contract, Dr. Coble is the sole and exclusive person to determine if referrals to medical specialists are necessary as well as which prescriptions and laboratory tests are necessary for an inmate's medical care. According to the proof, Dr. Coble reached the maximum of his financial incentives for each year of his contract. Although CCA argues that Dr. Coble would not make medical decisions based upon costs because to do so increases long term costs, that is an economic analysis. The Eighth Amendment forbids unnecessary suffering in the short term for inmates who are wholly dependent upon the state to provide such basic medical care. Inmates at SCCF do not have any another choice for a health care provider, just Dr. Coble. And, under his contract with CCA, Dr. Coble has significant financial incentives to limit inmate medical care. As noted by the AMA, this contract creates "serious potential conflicts" between Dr. Coble's personal financial interests and the medical needs of the inmates at SCCF.

The Court's conclusion should not be construed as barring a managed health care system with physician incentives in a prison setting. Moreover, the Court is not attempting to set compensation rates for medical services. Further, how this policy impacted a particular inmate is, as here, subject to individual determination. The Court simply concludes that this contract goes too far, as reflected in the actual expenditures for necessary medical services for inmates at SCCF that are far below what TDOC had allocated for these medical costs services.

Thus, the Court concludes that plaintiff's motion for judgment as a matter of law as to CCA should be granted in part so as to enjoin the current contract between CCA and Dr. Coble at SCCF. The motion is denied as to defendants Coble and Myers and insofar as this motion challenges the weight of the evidence, for the reasons stated in the denial of plaintiff's motion for a new trial.

### D. PLAINTIFF'S MOTION FOR SANCTIONS

In this motion, the plaintiff raises again the issue of sanctions because the defendants CCA and Myers did not supplement their discovery answers on the number of referrals to medical specialists. After an extensive review of this issue at trial, out of the presence of the jury, the Court concluded that the defendants failed to supplement timely their discovery responses on this issue. The Court further found that the defendants also failed to produce this new evidence as the basis for a material factual dispute on the plaintiff's motion for summary judgment. That motion clearly contained the factual statements about the numbers of referrals to medical specialists.

At trial, the Court extended an option to the plaintiff's counsel to exclude the proof of this new evidence or to allow the jury to hear the new evidence and to impose sanctions for the time expended by counsel during discovery of this issue. Plaintiff's counsel elected the former option and citing the Sixth Circuit authority relied upon, the Court imposed the sanction to bind the defendants to their earlier responses to

these discovery requests and assertions in response to this issue on the plaintiff's motion for summary judgment. The defendants contend that no further sanction is imposed given the drastic sanction of exclusion of the evidence, *K.M.C. Co., Inc. v. Irving Trust*, 757 F.2d 752, 765 (6th Cir.1985) and the plaintiff's election of alternative remedies. See *Tobin v. Astra Pharmaceutical Products, Inc.*, 993 F.2d 528, 541 (6th Cir.1993).

Under Fed.R.Civ.P. 37(b)(2)(B), the Court imposed at trial the appropriate sanction for this noncompliance with a discovery request. See Fed.R.Civ.P. 26(e)(1) and (2). The plaintiff derived the benefit of the Court's sanction at trial by not losing the time expended on this issue during discovery, and by being able to present her theory of the facts disclosed during the discovery period set by the Court. The only other appropriate sanction would be to award attorney's fees for the time in court and outside of court during the Court's consideration of this evidentiary dispute. The Court expects that this period would not involve any significant time or expense. Thus, the motion for sanctions is granted in part and denied to the extent that it seeks any relief beyond the above.

An appropriate Order is filed herewith.

### ORDER

In accordance with the accompanying Memorandum, plaintiff's motion to interview jurors (Docket Entry No. 307) is DENIED. The plaintiff's motion for judgment as a matter of law or in the alternative for a new trial (Docket Entry No. 308) is DENIED except for her claim that the defendant Correction Corporation of America's medical policy, as reflected in its agreement with Robert B. Coble, is unconstitutional in violation of the Eighth Amendment right of prisoners to medical care. The plaintiff's motion for sanctions (Docket Entry No. 321) is GRANTED, but only insofar as to award attorney's fees for the time in court expended on the plaintiff's objections to the evidence at issue.

Accordingly, the defendant Correction Corporation of America's medical policy, as reflected in its contract with Robert B. Coble, is declared unconstitutional in violation of the Eighth Amendment right of prisoners to medical care. The defendant Corrections Corporation of America and all parties acting in active concert with it are ENJOINED from enforcement of its contract with the defendant Robert B. Coble, as described in the accompanying Memorandum.